UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (CINCINNATI)

| | | |
|---|---|---|
| MARK CHARLTON-PERKINS, | : | |
| | : | Case No. 1:20-cv-179 |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge Timothy S. Black |
| | : | |
| UNIVERSITY OF CINCINNATI, et al., | : | **DEFENDANTS' MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| Defendants. | : | |

Defendants University of Cincinnati (the "University"), Ken Petren ("Dr. Petren"), and

George Uetz ("Dr. Uetz") request that the Court grant them summary judgment under Fed. R.

Civ. P. 56 on Plaintiff Mark Charlton-Perkins' claims under Title IX and 42 U.S.C. Sec. 1983.

Defendants submit there are no genuine disputes as to any material fact and that they are entitled

to judgment as a matter of law. Defendants rely on the following memorandum and the

discovery material separately filed in support of this motion. Also attached are Defendants'

proposed undisputed facts.

Respectfully submitted,

/s/ Evan T. Priestle
Evan T. Priestle (0089889)
Ivy J. Sander (100204)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Tel:    (513) 381-2838
Fax:    (513) 381-0205
epriestle@taftlaw.com
isander@taftlaw.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARK CHARLTON-PERKINS, | : | |
| | : | Case No. 1:20-cv-179 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, et al., | : | **MEMORANDUM IN SUPPORT OF** |
| | : | **DEFENDANTS' MOTION FOR** |
| Defendants. | : | **SUMMARY JUDGMENT** |

## I.    INTRODUCTION

Plaintiff asserts that the University and Drs. Petren and Uetz in both their official and personal capacities refused to hire him because of his gender in violation of Title IX, 20 U.S.C. Sec. 1681, et seq., and the Fourteenth Amendment's Equal Protection Clause via a claim under 42 U.S.C. § 1983.  Plaintiff asserts a failure-to-hire claim despite the fact that no hiring decision was ever made.  The job search was cancelled and the position was never filled.  Over five years have passed since the cancellation and the University has never sought to reopen the search.

Yes, a plaintiff could establish a *prima facie* case of discrimination for a failure to hire even when no hiring decision was made.  *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022).  But in those cases, the plaintiff must show that "defendant cancelled the position specifically to unlawfully discriminate against the plaintiff."  *Moore v. Abbott Lab'ys*, 780 F. Supp. 2d 600, 613 (S.D. Ohio 2011) (emphasis added).  That is not the case here.  The record is devoid of evidence that Dr. Petren (the decision maker) cancelled the search in order to discriminate against Plaintiff.  Rather, the evidence shows that Dr. Petren cancelled the search due to concerns about unfairness in the process to all the applicants and the ensuing turmoil within the Department of Biological Sciences.  In sum, why Plaintiff was not hired "had nothing to do with his gender."  (Deposition of George Uetz ("Uetz Dep."), Doc. 29, PageID 563)

1

## II.     RELEVANT FACTS

### A.     The University's Biological Sciences Department.

The University's Biological Sciences Department (the "Biology Department") is an academic unit within the College of Arts and Sciences.  Dr. Uetz was the Head of the Biology Department from 2015 to 2018.  (*Id*. at PageID 394-95)  As Head, Dr. Uetz was responsible for overseeing the administration of the Biology Department, including supervising faculty and staff hiring.  (*Id.* at PageID 393-94)  Dr. Uetz reported to Dr. Petren, the Dean of the College during the relevant period.  (*Id.* at PageID 395-96)  Dr. Petren served as the Dean from 2015 to 2019. (Deposition of Kenneth Petren ("Petren Dep."),  Doc. 49, PageID 1563)  As Dean, Dr. Petren was responsible for approving hires.  (*Id.*)  Dr. Petren also had sole authority to cancel a search. (Petren Dep., Doc. 49, PageID 1575; Uetz Dep., Doc. 29 at PageID 400)

### B.     The College's Hiring Processes.

Each year, the academic units within the College evaluate their staffing needs and submit hiring proposals to the Dean.  (Uetz Dep., Doc. 29 at PageID 402; Petren Dep., Doc. 49 at PageID 1563)  In the Biology Department, once the Dean approves a hiring proposal, the Head appoints departmental faculty members to serve on a search committee, including a committee chair.  (Uetz Dep., Doc 29 at PageID 403, 408)  The search committee refines the job advertisement, solicits and reviews applications, interviews candidates, ranks candidates, and provides a hiring recommendation to the Head.  (*Id.* at PageID 410)  The Head shares the search committee's findings and presents a recommendation to the Dean.  (*Id.* at PageID 397-98)  The Dean determines who receives the offer.  (*Id.*; Petren Dep., Doc. 49 at PageID 1563)

### C.     The Biology Department Began Its Search For A Cell Biologist.

In September 2017, the Biology Department began a search to hire an Assistant Professor of Cell Biology.  (Uetz Dep., Exhibit 1, Doc 29-1 at PageID 601)  Dr. Uetz appointed Dr. Elke

2

Buschbeck, a full professor in the department, as chair of the search committee. (Uetz Dep., Doc 29 at PageID 408-09) Dr. Uetz also appointed Joshua Benoit, Joshua Gross, and Dennis Grogan to serve on the committee. (Deposition of Elke Buschbeck ("Buschbeck Dep."), Doc. 31, PageID 790) At the time, Dr. Benoit was an Assistant Professor, Dr. Gross was an Associate Professor, and Dr. Grogan was a full Professor. (*Id.*) A graduate student served on the search committee but was a non-voting member. (Buschbeck Dep., Doc. 31 at PageID 790-91)

More than 60 individuals applied for the Assistant Professor of Cell Biology position. (*Id*. at PageID 824) On December 1, 2017, the search committee whittled down the list of applicants to nine candidates. (*Id*. at PageID 830-31) The committee then conducted Skype interviews with each of the nine remaining candidates, which included Plaintiff. (*Id*. at PageID 843-44; Deposition of Mark Charlton-Perkins ("Pl. Dep."), Doc. 27, PageID 169-70)

### D. After The Search Process Was Already Underway And Interviews Began, Dr. Buschbeck Sought Advice On How She Should Proceed Due to Her Relationship With Plaintiff.

On December 12, 2017, after several Skype interviews had taken place, including Plaintiff's, Dr. Buschbeck emailed the College's Director of Graduate Student Recruitment in Access and Diversity, Marilyn Kershaw, regarding Dr. Buschbeck's connection to Plaintiff. (Uetz Dep., Exhibit 3, Doc 29-3 at PageID 639-40) Specifically, Dr. Buschbeck asked,

> One of the candidates that made it to our top 9 list is one of my collaborators (at least we recently published a paper together). Does this count as a conflict of interest? If so how should we proceed?

(*Id.* at PageID 640) In response, Ms. Kershaw wrote,

> I would not say that it is a conflict of interest as it can be expected that faculty may know one another in the discipline. Let the committee members know your connection to the candidate and proceed as you would with any other finalist.

(*Id.* at PageID 639) Dr. Buschbeck was (and is) a personal friend of Plaintiff and the pair had

3

collaborated that very same year (2017) to co-author two research articles.  (Buschbeck Dep., Doc. 31 at PageID 816, 818, 821-21; Pl. Dep., Exhibit Q, Doc. 27-17, PageID 367)

Dr. Buschbeck advised Ms. Kershaw that she had mentioned her connection to the other search committee members.  (Uetz Dep., Exhibit 3, Doc 29-3 at PageID 639)  Dr. Buschbeck disclosed her connection to Plaintiff around the time the search committee determined its top nine list.  (Buschbeck Dep., Doc. 31 at PageID 859)

### E.    The Search Committee Selected Four Qualified Finalists And Initially Could Not Agree On The Top Candidate But Eventually Voted For Plaintiff.

On December 14, 2017, the search committee narrowed the list to five candidates who were invited to campus for final interviews.  (Uetz Dep., Exhibit 3, Doc 29-3 at PageID 640; Buschbeck Dep., Doc. 31 at PageID 845)  One of the five finalists declined her invitation, leaving four finalists (two men and two women), including Plaintiff.  (Uetz Dep., Exhibit 3, Doc. 29-3 at PageID 640-41; Buschbeck Dep., Doc. 31 at PageID 846)  Campus visits took place in February 2018.  (Uetz Dep., Exhibit 3, Doc. 29-3 at at PageID 642)

On February 21, 2018, the search committee, along with Dr. Uetz, met to discuss the committee's recommendation.  (Buschbeck Dep., Doc. 31 at PageID 879; Uetz Dep., Doc 29 at PageID 556, 570)  Each committee member had a different candidate ranked in the top spot.[1] (Buschbeck Dep., Doc. 31 at PageID 880; Uetz Dep., Doc 29 at PageID 432; Deposition of Joshua Benoit ("Benoit Dep."), Doc. 35 at PageID  1171-72; Deposition of Joshua Gross ("Gross Dep."), Doc. 39 at PageID 1327)  Thus, Dr. Buschbeck asked each committee member to make a case for their top choice.  (*Id.*)  In the course of that discussion, the committee recognized that Dr. Eugene Shakirov was the least preferred candidate overall, so agreed to remove him from the

---

[1] Dr. Buschbeck ranked Charlton-Perkins first.  (Uetz Dep., Doc 29 at PageID 573)  Dr. Benoit ranked Orly Levitan first.  (Benoit Dep., Doc. 35 at Page ID 1172)  Dr. Grogan ranked Eugene Shakirov first.  (Uetz Dep., Exhibit 23, Doc. 29-23 at PageID 765)  Dr. Gross ranked Eve Schneider first.  (*Id.* at PageID 763)

running.  (Buschbeck Dep., Doc. 31 at PageID 880-81; Benoit Dep.,  Doc. 35 at PageID 1172)

Dr. Uetz listened to everyone present their case and took notes of the discussion.  (Uetz Dep., Doc 29 at PageID 432, 570-71; Uetz Dep., Exhibit 23, Doc. 29-23 at PageID 762)  Seeing no consensus for a top recommendation, the committee agreed to take a night to sleep on it and then try again.  (Uetz Dep., Doc 29 at 548)  On February 23, 2018, the search committee reconvened and voted again, with the results this time being a 3-1 vote in favor of Plaintiff as the top candidate.[2]  (Buschbeck Dep., Doc. 31 at PageID 883, 886-87)  Dr. Buschbeck shared with Dr. Uetz the search committee's 3-1 vote recommending Plaintiff.  (*Id.* at PageID 886-87)

F.    **Dr. Uetz Met With Dr. Petren To Present The Search Committee's Recommendation And Inform Him Of Reported Conflict of Interest Concerns.**

On February 27, 2018, Dr. Uetz met with Dr. Petren to discuss the search committee's recommendation.  (Uetz Dep., Doc. 29 at PageID 433; Uetz Dep., Exhibit 18, Doc. 29-18 at PageID 744; Petren Dep., Doc. 49 at PageID 1566-67, 1573)  At that time, Dr. Uetz had every intention of following the committee's recommendation and recommending Plaintiff for hire.[3] (Uetz Dep., Doc. 29 at PageID 433, 489, 535)  But between the time he received the search committee's recommendation and his meeting with Dr. Petren, other faculty reported to Dr. Uetz that they believed Dr. Buschbeck had acted improperly during the search.  (*Id.* at PageID 433)

The first two who reported their concerns to Dr. Uetz were Drs. John Layne and Stephanie Rollmann.  (*Id.* at PageID 434-35)  Dr. Layne told Dr. Uetz that he felt there was "something fishy going on" and that Dr. Buschbeck "was trying to bias the search in [Plaintiff's]

---

[2] Drs. Buschbeck, Benoit, and Grogan voted Plaintiff as their top candidate. (Buschbeck Dep, Exhibit 37, Doc. 31-13 at PageID 1062)  Dr. Gross and the graduate student voted for Dr. Schneider as their top candidate.  (*Id.*)
[3] In informing Dr. Petren of his and the committee's recommendation, Dr. Uetz asked Dr. Petren in this meeting if it was permissible to hire a man when there were two equally qualified women candidates.  (*Id.* at PageID 429-30) The candidates' gender was briefly discussed in this context and concluded with Dr. Petren confirming that there was nothing impermissible about hiring a male in this scenario.  (*Id*. at PageID 431, 459, 489)

5

favor . . . because they're colleagues and social friends." (*Id.* at PageID 435-36)  Dr. Layne was so concerned over the issue that his comments to Dr. Uetz  "were embellished with expletives." (*Id.*)  Dr. Rollmann echoed the same concerns and told Dr. Uetz that she thought Dr. Buschbeck should have recused herself from any discussion about Plaintiff.  (*Id.* at PageID 435)  Although Dr. Uetz had intended on recommending Plaintiff for hire when going in to his meeting with Dr. Petren, given the concerns that were brought to him, Dr. Uetz also "felt an obligation to raise those issues of impropriety" with Dr. Petren.  (*Id.*)  Dr. Petren instructed Dr. Uetz to investigate and find out if other faculty shared the concerns of Drs. Layne and Rollmann.  (*Id.* at PageID 459; Petren Dep., Doc 49 at PageID 1566, 1573, 1589)

### G.    Dr. Uetz Investigated The Conflict Of Interest Concerns And Based On What He Learned, Drs. Petren And Uetz Put The Hiring Decision On Hold While They Explored Alternative Options.

As Dr. Petren directed, Dr. Uetz proceeded to talk to additional faculty, including search committee member Dr. Gross.  (Uetz Dep., Doc. 29 at PageID 539)  Dr. Gross advised that he felt like Dr. Buschbeck had bullied the junior faculty on the search committee to get them to vote a certain way.  (*Id.* at PageID 566)  Dr. Gross felt there was a conflict of interest between Dr. Buschbeck and Plaintiff and he was uncomfortable with the search process.  (Gross Dep., Doc. 39 at PageID 1305-07, 1326)  Dr. Gross reported his concerns to Dr. Bruce Jayne, Assistant Head of the Biology Department.  (*Id.* at PageID 1305-06)  Dr. Jayne also had received concerns about Dr. Buschbeck's conduct during the search and reported these concerns to Dr. Uetz. (Deposition of Bruce Jayne ("Jayne Dep."), Doc. 45 at PageID 1459-60)

Approximately six faculty members expressed to Dr. Uetz their concerns about Dr. Buschbeck's prior collaboration with Plaintiff and her advocacy for Plaintiff during the search process.  (Uetz Dep., Doc. 29 at PageID 539)  On March 2, 2018, Dr. Uetz met with Dr. Petren to share what he had learned.  (Petren Dep., Doc. 49 at PageID 1566, 1575; Uetz Dep., Doc. 29

6

at PageID 459; Uetz Dep., Exhibit 18, Doc. 29-18 at PageID 744)

Hearing more about the faculty's concerns, Dr. Petren felt that there was at least a perceived, if not acted on, conflict of interest that had tainted Plaintiff's candidacy.  (Petren Dep., Doc. 49 at PageID 1591)  In light of this, Dr. Petren concluded he would have trouble offering the position to Plaintiff.  (*Id.* at PageID 1575)  Thus, Drs. Petren and Uetz put the hiring decision on hold while they explored possible alternatives.  (Petren Dep., Doc. 49 at PageID 1567, 1573)  To that end, Drs. Petren and Uetz briefly discussed whether it would be a viable alternative to seek to hire one of the other two remaining candidates given that the search committee had found all finalists acceptable.  (*Id.* at PageID 1567, 1590-91)  Given the time and effort involved in any search, Dr. Petren thought that moving forward with hiring one of the other two remaining candidates could be a way to salvage the search while avoiding the conflict of interest concerns that had been raised.  (*Id.*)  Drs. Petren and Uetz were exploring the option of hiring the other two candidates because they had been deemed acceptable by the search committee and presented no conflict of interest issues, not because they were female.  (*Id.* at PageID 1600)

On March 4, 2018, Dr. Uetz emailed the search committee that he and Dr. Petren would like to try to focus on the other two candidates and asked the search committee to contact them to determine their availability and continued interest.[4]  (Uetz Dep., Doc. 29 at PageID 536-37; Uetz Dep., Exhibit 19,  Doc. 29-19 at PageID 751)  Dr. Uetz did not initially mention the conflict of interest issues so as to spare Dr. Buschbeck's feelings.  (Uetz Dep., Doc. 29 at PageID 537)

Dr. Uetz's email was met with intense backlash from Dr. Buschbeck, who accused Dr. Uetz of discrimination and disrespect, and soon after the Department was sent into chaos.  (Uetz

---

[4] In his March 4, 2018 email to the search committee, Dr. Uetz suggested an appropriate path forward would be to "focus on the women candidates first." (Uetz. Dep., Exhibit 19, Doc. 29-19 at PageID 751)  Though the remaining two finalists were identified in that email as "women candidates," that was simply a shorthand to identify the remaining candidates because they were, in fact, women. (Uetz. Dep., Doc. 29 at PageID 459, 487-88, 530)

Dep., Exhibit 19,  Doc. 29-19 at PageID 750-51)  At a faculty meeting on March 8, 2018, and

after the conflict issues had been mentioned, Dr. Buschbeck made a passionate statement

defending herself against any conflict accusations.  (Uetz Dep., Exhibit 17, Doc. 29-17 at PageID

740; Uetz Dep., Doc. 29 at PageID 541)  After that meeting, one faculty member sent an email to

Dr. Uetz reiterating his concerns with the search.  (Uetz Dep., Exhibit 15, Doc. 29-15 at PageID

736)  This faculty member explained that he wondered "how did  [Plaintiff] warrant this high

rating …? … [Plaintiff's] rise in my opinion is tainted." (*Id.*)

## H.    Dr. Petren Cancelled The Search Amid The Conflict Of Interest Accusations And Growing Turmoil Within The Biology Department.

This chaos quickly reached Dr. Petren.  (Petren Dep. Doc. 49 at PageID 1583-84, 1599;

Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658, 661-62)  Additionally, Dr. Petren had also since

seen evidence himself of Dr. Buschbeck's partiality toward Plaintiff.  (Petren Dep. Doc. 49 at

PageID 1602)  Specifically, Dr. Petren saw emails demonstrating Dr. Buschbeck's advocacy for

Plaintiff, including where Dr. Buschbeck would challenge negative feedback about Plaintiff.  (*Id*;

Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageID 1072, 1074, 1076)

For example, Dr. Culley told Dr. Buschbeck that she "was not really excited about

[Plaintiff]" and that she got the sense that "he was not really interested in the position."

(Buschbeck Dep., Exhibit 44, Doc. 31-20 at PageID 1072)  Dr. Buschbeck responded that her

"experience is quite different from my own (and that of some I talked to)" and challenged Dr.

Culley's feedback regarding Plaintiff's interest in the position.  (*Id.*)  Dr. Culley believed Dr.

Buschbeck's email crossed the line and reflected her conflict of interest.  (Deposition of Theresa

Culley ("Culley Dep."), Doc. 37 at PageID 1226-27)  Dr. Buschbeck also attempted to rebut

feedback from two other faculty members concerned with Plaintiff's lackluster seminar

performance, telling them, "not that I want to make excuses, but I know that he had recent

8

surgery and still is quite sick from some complications." (Buschbeck Dep., Exhibit 46, Doc. 31-22 at PageID 1074; Buschbeck Dep., Exhibit 47, Doc. 31-23 at PageID 1076)

Considering all of this, it became clear to Dr. Petren that the faculty had very strong opinions on both sides of this search and that the situation had created deep divisions within the Biology Department. (Petren Dep. Doc. 49 at PageID 1575-76; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658, 661-62) Dr. Petren decided that it would not be fair to any candidate to hire them in to the Department at that time and that the only viable outcome was to cancel the search. (Petren Dep., Doc 49 at PageID 1576)

Dr. Petren was troubled by even the perception of a conflict of interest. (Petren Dep., Doc. 49 at PageID 1576, 1599; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 659-60, 671) And he could not ignore the emails reflecting Dr. Buschbeck's partiality. (Petren Dep., Doc. 49 at PageID 1576, 1599, 1602; Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageIDs 1072, 1074, 1076) Dr. Petren felt that Dr. Buschbeck's advocacy for Plaintiff was unfair to the other candidates who did not have an equivalent voice fighting for them on the search committee. (Petren Dep., Doc. 49 at PageID 1602-03) Moreover, Dr. Petren felt the whole situation had created such a rift within the Department that he did not think it would be fair to bring anyone into such a contentious environment. (*Id.* at PageID 1575-76, 1584, 1593; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658, 661-62) As a result, Dr. Petren made the decision to cancel the search.

On March 13, 2018, Dr. Petren informed the faculty that he had cancelled the search. (Uetz Dep., Exhibit 20, Doc. 29-20 at PageID 758) On March 21, 2018, Dr. Petren met with the Biology Department faculty to explain the cancellation and answer questions. (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 657) This meeting quickly turned contentious, confirming Dr.

9

Petren's worry about the fractures within the Department.  (*See id.* at PageID 660, 664, 673)

> **I.  The Cell Biology Associate Professor Position Was Never Filled And The Search Was Never Re-Opened.**

Dr. Petren intended to approve the Biology Department for another hire the following year.  (Petren Dep., Doc. 49 at PageID 1578-79)  But, as explained above, the faculty members make the proposals regarding the focus of the search.  (Uetz Dep., Doc. 29 at PageID 402; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 671; Petren Dep., Doc. 49 at Page ID 1579)  Dr. Petren's only role is to consider the proposal(s).  (*Id.*)  By the following year, the Biology Department's needs had shifted.  (Culley Dep., Doc. 37 at PageID 1257-58)  The Department concluded that it no longer needed a cell biology researcher and that it could no longer afford the start-up costs to fund a cell biology lab.  (*Id.* at PageID 1258-59)  The Associate Professor in Cell Biology position has never again been posted.  (Petren Dep., Doc. 49 at PageID 1580).

## III.  ARGUMENT

Plaintiff's claims that the University and Drs. Petren and Uetz refused to hire him due to his gender in violation of Title IX and the Fourteenth Amendment's Equal Protection Clause fail. To start, the Court need not even consider the merits of Plaintiff's §1983 claim against Drs. Petren and Uetz in their official capacities because Eleventh Amendment immunity bars those claims.  Further, Plaintiff fails to assert any cognizable claims against Drs. Petren and Uetz in their personal capacities and they are both entitled to qualified immunity.  The Court need not consider the merits of Plaintiff's Title IX claim because Plaintiff was working and living in the United Kingdom at the time of the challenged conduct and, thus, was not covered by Title IX.

Nonetheless, even considering the merits, Plaintiff's claims fail. A motion for summary judgment must be granted when there is no genuine dispute as to any material fact. *See Li v. Univ. of Akron*, No. 5:21-CV-2277, 2023 WL 4133647, at *3 (N.D. Ohio June 22, 2023)  Once

129748602v1

the moving party has presented evidence supporting its motion for summary judgment, the nonmoving party must present affirmative evidence supporting his or her position. *Id.* at *4. To be sure, "conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment." *Id.*

Here Defendants have articulated legitimate, nondiscriminatory reasons for cancelling the search and Plaintiff cannot show that Defendants' reasons were a pretext for gender discrimination. Accordingly, Plaintiff cannot demonstrate any genuine disputes of material fact and his claims should be dismissed.

### A. Eleventh Amendment Immunity Bars Plaintiff's § 1983 Claim Against Drs. Petren and Uetz In Their Official Capacities.

Eleventh Amendment immunity bars Plaintiff's Equal Protection claim against Drs. Petren and Uetz in their official capacities. The Eleventh Amendment "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens." *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (internal citations omitted). The University is a public university in the State of Ohio. *See* Ohio Rev. Code § 3361.01. The "University, as an arm of the State, is immune from suit under the Eleventh Amendment because it is well-settled that a plaintiff is precluded from directly suing a State in federal court…." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). And a "suit against state officials in their official capacities is not a suit against the officials but rather is a suit against the officials' offices and, thus, is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (syllabus).

Additionally, while *Ex Parte Young* permits prospective injunctive relief against state actors in their official capacities in certain circumstances, "a declaratory judgment against state officials declaring that they violated federal law in the past constitutes retrospective relief, and is

barred by the Eleventh Amendment." *Brown v. Strickland*, No. 2:10-CV-166, 2010 WL

2629878, at *4 (S.D. Ohio June 28, 2010) (citing *Green v. Mansour*, 474 U.S. 64, 67 (1985)).

"If a complaint against a state official is 'based entirely on past acts and not continuing conduct

that, if stopped, would provide a remedy to them, ... it ... does not come under the doctrine of *Ex*

*parte Young.*'" *Finley v. Murphy*, No. 2:19-CV-01449, 2020 WL 68574, at *3 (S.D. Ohio Jan. 7,

2020) (quoting *Gean v. Hattaway*, 330 F.3d 758, 776 (6th Cir. 2003)).

Even if Plaintiff limits his Equal Protection claim to the remedy of "instatement," that

does not salvage his claim.  First, Dr. Petren is no longer the Dean and Dr. Uetz is no longer the

Head of the Department.  (Petren Dep., Doc. 49 at PageID 1562-63; Uetz Dep., Doc. 29 at

PageID 391-92)  A plaintiff "must show that Defendants 'are the ones who have the power to

provide the relief sought, whether or not they were involved in the allegedly illegal conduct at

issue.'" *Adams v. MaCauley*, No. 1:23-CV-18, 2023 WL 1794116, at *5 n.2 (W.D. Mich. Feb.

7, 2023) (quoting *Taaffe v. Drake*, No. 2:15-cv-2870, 2016 WL 1713550, at *5 (S.D. Ohio Apr.

29, 2016)).  Neither Dr. Petren nor Dr. Uetz "have the power to provide the relief sought."

Second, Plaintiff's claim is not for "reinstatement."  Rather, his request is for

"instatement," which would require an order that Dr. Petren or Dr. Uetz create a position that

does not exist and provide it to Plaintiff.  Whether a request for "instatement" falls within the *Ex*

*Parte Young* exception "is a close question to which neither the Supreme Court nor any of the

circuits provides a clear answer." *Smith v. Sec'y of Dep't of Envtl. Prot. of Penn.*, 540 F. App'x

80, 82 (3d Cir. 2013).  But with no existing position for Plaintiff to be "instated," it is not a

"close question."  Plaintiff's request is not one for injunctive relief.  Rather, "instatement" would

require creating a position that does not exist.  In other words, it would compel the University—

not Dr. Petren or Dr. Uetz—to expend resources not in use by creating a position and placing

12

Plaintiff in it.  "[A] suit nominally directed at an officer, but seeking judicial compulsion against the sovereign, is barred."  *TransAmerica Assur. Corp. v. Settlement Capital Corp.*, 489 F.3d 256, 260 (6th Cir. 2007) (citation and internal quotation omitted)  Plaintiff's § 1983 claims against Drs. Petren and Uetz in their official capacities are therefore barred by the Eleventh Amendment.

### B.     Plaintiff's Title IX Claim Fails Because He Was Not A "Person In The United States" At The Time Of The Alleged Harm.

Title IX states "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  The plain language of Title IX only applies to a "person in the United States...." 20 U.S.C. § 1681(a).

Unlike Title VII, which Congress amended to cover U.S. citizens working in foreign countries, 42 U.S.C. §§ 2000e(f), Title IX provides only that "no person in the United States" shall be discriminated against on the basis of sex.  20 U.S.C. § 1681(a).  "[N]othing in the Title IX statute's plain language indicates that Congress intended it to apply outside the U.S. and that the plain meaning of 'person in the United States' suggests that Title IX only applies to persons located in the United States, even when that person is participating in a recipient's education program or activity outside the United States."  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 FR 30026-01, at *30206 (May 19, 2020).  "[R]estricting Title IX coverage to persons in the United States applies the statute as passed by Congress."  *Id.* at *30474.

Plaintiff was living and working in the United Kingdom at the time of the allegedly discriminatory conduct.  (Amended Compl., Doc. 8 at PageID 31; Pl. Dep., Doc. 27 at PageID 181)  He was not a "person in the United States," so Title IX does not apply to him and his claims fail as a result.

**C.     Plaintiff's Gender Discrimination Claims Under Both Title IX And The Equal Protection Clause Fail Because Plaintiff Cannot Show That Dr. Petren's Legitimate Non-Discriminatory Reasons For Cancelling The Job Search Were A Pretext For Gender Discrimination.**

"To bring a successful § 1983 claim under the Fourteenth Amendment's Equal Protection Clause, [a plaintiff] must allege the same elements as are required to establish a disparate treatment claim under Title VII." *Herman v. Ohio Univ.*, No. 2:19-CV-201, 2019 WL 6242159, at *5 (S.D. Ohio Nov. 22, 2019) (citations omitted).  The same goes for a plaintiff asserting a Title IX claim.  *See Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 284 (6th Cir. 2017) (citations omitted). This means Plaintiff's gender discrimination claims are subject to the familiar *McDonnell Douglass* burden shifting framework.  *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 962 (S.D. Ohio 2010) (citation omitted).  If a plaintiff can establish a *prima facie case*, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason(s) for its decision.  *Id*. at 963.  Once the defendant does so, the burden shifts back to the plaintiff to show that reason(s) is a pretext for unlawful discrimination.  *Id.*

To make out a *prima facie* case of failure to hire, Plaintiff must show:  (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment decision; and (4) he was rejected for the position and [Defendants] continued to seek applications from persons with [Plaintiff's] qualifications and/or that a person outside the protected class was hired.  *Barrow v. Terminix Int'l Co., L.P.*, No. 3:07-CV-324, 2009 WL 243093, at *8 (S.D. Ohio Jan. 29, 2009).  While the standard and the burden-shifting framework used for disparate treatment claims is routine, the circumstances of Plaintiff's claims are not.

First, because Plaintiff "is male and seeking to prove reverse discrimination, he must demonstrate background circumstances which support the suspicion that the defendant is the rare employer who discriminates against the majority." *Hofmann v. Bethesda Found., Inc.*, No. 1:17-

CV-143, 2018 WL 4094810, at *11 (S.D. Ohio Aug. 28, 2018) (citation and internal quotations omitted). He cannot. Second, Plaintiff's claim is a failure-to-hire claim where no hiring decision was actually made. So the fourth prong is modified such that Plaintiff must be able to "establish that the [Defendants] cancelled the position specifically to unlawfully discriminate against the plaintiff." *Moore*, 780 F. Supp. at 613. Again, he cannot.

And even if Plaintiff could establish these elements, he still must prove that the University's articulated, legitimate nondiscriminatory reasons for cancelling the job search were pretext for gender discrimination. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006).

Dr. Petren cancelled the search and it was his decision alone to make. (Petren Dep., Doc. 49, at PageID 1575; Uetz. Dep., Doc. 29 at PageID 400, 509) Dr. Petren was troubled by the sheer perception of a conflict of interest between Dr. Buschbeck and Plaintiff. (Petren Dep., Doc. 49, at PageID 1576, 1599; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 659-60, 671) He was also deeply troubled by the email evidence of Dr. Buschbeck's partiality. (Petren Dep., Doc. 49, at PageID 1576, 1599, 1602; Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageID 1072, 1074, 1076) Dr. Petren felt that Dr. Buschbeck's unmatched advocacy for Plaintiff was unfair to the other candidates who did not have an equivalent voice fighting for them. (Petren Dep., Doc. 49 at PageID 1602-03) Finally, and perhaps most importantly, Dr. Petren felt the whole situation had created such a rift within the department that he concluded it would be unfair to bring *anyone* into such a contentious environment. (*Id.* at PageID 1575-76, 1584, 1593; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 661-62) Dr. Petren cancelled the search for these legitimate, nondiscriminatory reasons.

Plaintiff cannot establish that Dr. Petren's reasons for cancelling the job search at issue were pretextual and that his real reason was "specifically to unlawfully discriminate against"

15

Plaintiff because he is male.  *Moore*, 780 F. Supp. at 613.   A plaintiff can show pretext by showing that: (1) the defendant's stated reason has no basis in fact; (2) the reasons did not actually motivate defendant; or (3) the proffered reason was not sufficient to warrant the action.  *Finch*, 689 F. Supp. 2d at 963.  Plaintiff cannot succeed under any of these approaches.

First, to show that a defendant's reasons have no basis in fact, a plaintiff must present "evidence that the reasons given by the employer simply did not happen."  *Lawroski v. Nationwide Mut. Ins. Co.*, 981 F. Supp. 2d 704, 712 (S.D. Ohio 2013), *aff'd in part*, 570 F. App'x 589 (6th Cir. 2014) (internal quotations and citation removed).  It is undisputed that Plaintiff had recently collaborated with Dr. Buschbeck when he applied.  And it is that very relationship which Dr. Petren felt created at least a perceived, if not actual, conflict of interest.  (Uetz Dep., Exhibit 7,  Doc. 29-7 at PageID 659-660)  It is also undisputed that Dr. Buschbeck sent several emails challenging several faculty members' negative feedback about Plaintiff.  (Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageID 1072, 1074, 1076)  Nor can it be disputed that Dr. Buschbeck did not recuse herself as chair of the search committee or even from any discussions regarding Plaintiff.  (Buschbeck Dep., Doc. 31 at PageID 859-60)  Likewise it is undisputed that there was discord among the faculty as a result of the search.  (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 661-62, 664; Culley Dep., Doc. 37 at PageID 1254; Jayne Dep., Doc. 45 at PageID 1461)  Accordingly, Plaintiff cannot demonstrate that the articulated reasons supporting Dr. Petren's decision to cancel the search were not based in fact.

Second, to show an employer's reasons did not actually motivate the decision (here, the search cancellation), plaintiffs may try to show "circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant" and that the employer's cited reason is a "coverup."  *Lawroski*, 981 F. Supp. 2d at 715 (citation omitted).  Plaintiff may

16

point to comments made by departmental faculty members about gender diversity within the Biology Department to argue that illegal discrimination was the true reason behind the cancellation. But any such comments are stray comments with no connection to the decision maker; as a result, they are insufficient to establish pretext. Any efforts from Plaintiff to assert otherwise would be only based on his speculation and conjecture which are insufficient to create a genuine dispute of material fact. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

For example, the Sixth Circuit rejected a Caucasian male's reverse gender discrimination case when the university's president had said in an email that "women are more efficient than men" and in a separate job search had also said "there are women and minorities out there, 'go find one.'" *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004); *see also Theidon v. Harvard Univ.*, 948 F.3d 477, 504-05 (1st Cir. 2020) ("Singer's observations . . . that the Anthropology Department was 'dysfunctional' and the Visiting Committee's recommendations for increasing gender and racial diversity among tenured professors within the Department are too general to constitute circumstantial evidence of discriminatory animus against Theidon in particular.").

Further, "the discriminatory or retaliatory animus of a coworker is not usually relevant to whether the employer violated Title VII. Rather, the relevant beliefs or motivations are those of the actual decisionmaker." *Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008) This is especially true in Title IX cases because "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct" and therefore "it is inappropriate to use agency principles to impute liability to [a school] for the misconduct of its teachers." *Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020) (stating that liability under Title IX "requires that the institution itself be deliberately indifferent to known acts of ... discrimination" and that "Cat's paw liability, therefore, has no place in Title IX actions.") (citation and internal quotations omitted). The same

17

goes for § 1983 claims. *See Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their individual capacities under § 1983 can be held liable only on their own unconstitutional behavior.").

Regarding the third avenue for showing pretext, Plaintiff may try to point to Marilyn Kershaw's advising Dr. Buschbeck that her prior collaboration with Plaintiff was not a conflict of interest and that she could proceed as she would with any other candidate as evidence that the reasons offered for why the search was cancelled did not actually motivate the decision to cancel. But Dr. Petren was the sole decision maker as he is the individual who had authority to cancel the search. (Petren Dep., Doc. 49 at PageID 1575) Despite Ms. Kershaw's advice, Dr. Petren felt that Dr. Buschbeck should have recused herself. (Petren Dep., Doc. 49 at PageID 1581) Further, as discussed above, Dr. Petren's decision to cancel the search was based on more than just whether Dr. Buschbeck should have recused herself. Dr. Buschbeck's demonstrated partiality and advocacy, as well as the divisiveness among the faculty, were significant factors in his decision to cancel the search.

Moreover, a plaintiff cannot establish pretext where the defendant honestly believed in its legitimate, non-discriminatory reason. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Dijon v. Cent. Ohio Transit Auth.*, No. 22-3884, 2023 WL 4080153, at *5 (6th Cir. June 20, 2023) (citation omitted) For example, this Court found that an employment decision in a reverse gender discrimination case was reasonably informed, considered, and based on an honest belief that the plaintiff had engaged in wrongdoing; plaintiff failed to point to any

18

129748602v1

evidence demonstrating otherwise and was therefore unable to show that defendant's articulated reason for the employment decision were pretextual. *Hardesty v. Kroger Co.*, No. 1:16-CV-367, 2018 WL 1411156, at *8 (S.D. Ohio Mar. 21, 2018), *aff'd*, 758 F. App'x 490 (6th Cir. 2019). Thus, even if Dr. Petren was mistaken about whether there was a conflict of interest and Ms. Kershaw's advice should have prevailed, that does not establish pretext.

Here, Plaintiff cannot point to evidence of discriminatory animus attributable to Dr. Petren. Rather, the evidence demonstrates that Dr. Petren did not consider the gender of the candidates in deciding to cancel the search, and that Plaintiff cannot show that Dr. Petren's legitimate, nondiscriminatory reason for cancelling the search was somehow pretextual.

**D.     As To Plaintiff's Claims Against Defendants Petren And Uetz In Their Personal Capacities, Such Claims Fail Because They Are Both Entitled to Qualified Immunity As A Matter Of Law.**

Qualified immunity shields government officials from liability for damages for actions that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Watson v. Pearson*, 928 F.3d 507, 510 (6th Cir. 2019) (citation omitted). To defeat qualified immunity, a plaintiff must establish: (1) that the defendant violated a statutory or constitutional right and (2) that said right was clearly established at the time of the alleged violation. *See id.* For a § 1983 claim, a plaintiff must demonstrate that he has been deprived of a right secured by the Constitution or Federal laws. *See Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984). The plaintiff must prove that "the employer made an adverse employment decision with a discriminatory intent and purpose." *Boger v. Wayne County*, 950 F.2d 316, 324–25 (6th Cir. 1991) (citation and internal quotation omitted).

To the extent Plaintiff's § 1983 claim is based on a theory that some faculty member reported concerns about Dr. Buschbeck with the intent to discriminate against Plaintiff's sex, such conduct does not violate a clearly established right.

19

> The district court's qualified immunity analysis contoured the right in question at too high a level of generality. The pertinent question is not whether the law banning discrimination on the basis of sex is clearly established, but a more nuanced one: whether reporting a potential policy violation up the chain of command with the intent to cause a fellow officer to lose their job, due to that officer's sex and/or sexual orientation, constitutes a clearly established constitutional violation. As our caselaw on this issue has gone in conflicting directions, we find that the answer to that question is no.

*Yerkes v. Ohio St. Highway Patrol*, No. 22-3030, 2022 WL 17753528, at *5 (6th Cir. Dec. 19, 2022) (internal citations omitted). Plaintiff cannot establish that, Dr. Petren, in consultation with Dr. Uetz, violated a clearly established constitutional right by cancelling the search due to complaints about favoritism and resulting unrest in the department. *See Godawa v. Byrd*, 798 F.3d 457, 467 (6th Cir. 2015) ("The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality.") (internal quotations and citation omitted).

Furthermore, as established above, Plaintiff fails to demonstrate that Dr. Petren, in consultation with Dr. Uetz, cancelled the search with any discriminatory intent and purpose. The record is devoid of any evidence that would create a genuine dispute of material fact as to this issue. To the contrary, the record before the Court demonstrates precisely what occurred during the search, the concerns that arose during the search, and the decision to cancel the search as a result of the complaints and unrest in the department. (Petren Dep., Doc. 49 at PageID 1566-67, 1575-76, 1584, 1593, 1599, 1602-03; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658-62, 671)

## IV.    **CONCLUSION**

The job search Plaintiff applied for at the University was cancelled for the reasons set forth above and in the record materials. Because the undisputed facts show there is no material dispute regarding the reason for that cancellation, Plaintiff's claims against the University and its employees fail, and the University is entitled to judgment as a matter of law. Defendants request that the Court grant their motion for summary judgment.

20

Respectfully submitted,

*/s/ Evan T. Priestle*
Evan T. Priestle (0089889)
Ivy Sander (100204)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Tel:    (513) 381-2838
Fax:    (513) 381-0205
epriestle@taftlaw.com
isander@taftlaw.com

*Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2023, I filed Defendants' Motion for Summary Judgment using the Court's CM/ECF system, which will send electronic notice to the following:

Marc Mezibov
Mezibov Butler
615 Elsinore Place
Suite 105
Cincinnati, OH 45202
mmezibov@mezibov.com

*/s/ Evan T. Priestle*
Evan T.  Priestle

22