**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **MARK CHARLTON-PERKINS** | **:** | **Case No.: 1:20-cv-179** |
| | **:** | |
| **Plaintiff,** | **:** | **Judge Black** |
| | **:** | |
| **vs.** | **:** | |
| | **:** | |
| **UNIVERSITY OF CINCINNATI,** | **:** | |
| **et al.,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

_____

**MEMORANDUM IN OPPOSITION TO DEFENDANTS UNIVERSITY OF**
**CINCINNATI, KENNETH PETRON, AND GEORGE UETZ'S MOTION FOR**
**SUMMARY JUDGMENT**
_____

### Table of Contents

I.    Introduction.................................................................................1

II.   Statement of Material Facts ......................................................1

III.  Law and Argument

    A.  Summary Judgment Standard.....................................................7

Authority:

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)

*DePiero v. City of Macedonia,* 180 F.3d 770, 776 (6th Cir. 1999)

*Reeves v. Sanderson Plumbing,* 530 U.S. 133, 151 (2000)

    B.  Title IX and Equal Protection ....................................................14

         1.  Extraterritoriality.............................................................14

         Authority:

*Davis v. Monroe County Bd. Of Ed.,* 526 U.S. 629, 631, 119 S.Ct. 1661 (1999)

*King v. Bd. Of Control of Mich. Univ.,* 221 F.Supp. 2d. 783 (E.D. Mich. 2002)

*Phillips v. St. George's University,* 2007 WL 3407728 (E.D. New York Nov. 15, 2007).

2.  There are Genuine Issues of Material Fact Regarding Plaintiff's Title IX and Equal Protection Claims. ................................................... 16

Authority:

*Charlton-Perkins v. Univ. of Cincinnati, et al.* No. 21-3840 at *11 (6th Cir. June 3, 2022)

*Ivan v. Kent State University,* 92 F.3d 1185 (Table), 1996 WL 422496 (th Cir. 1996).

*Moore v. Abbott Laboratories*, 780 F.Supp.2d 600, 618 (S.D. Ohio 2011)

*Raadschelders v. Columbus State Community College,* 377 F.Supp.3d 844 (S.D. Ohio 2019).

*Weburg v. Franks,* 229 F.3d 514, 522 (6th Cir. 2000)

*White v. Columbus Metropolitan Housing Authority*, 429 F.3d. 232,238 (6th Cir. 2006)

3.  Pretext. ........................................................................... 23

Authority:

*Bostock v. Clayton Cty. Georgia,* 140 S. Ct. 1731, 1739 (2020)

*Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009)

C.  11th Amendment Immunity........................................................ 23

*Carten v. Kent State Univ.,* 282 F.3d 391, 395 (6th Cir. 2002)

*Diaz v. Michigan Dep't of Corr.,* 709 F.3d 956, 964 (6th Cir. 2013)

*McDonald v. Village of Northport Michigan,* 164 F.3d 964, 970 (6th Cir. 1999)

D. Qualified Immunity......................................................................................29

Authority:

*Leadbetter v. Gilley,* 385 F.3d 683, 690 (6th Cir. 2004)

*Pierce v. Commonwealth Life Insurance Co.,* 40 F.2d 796, 801-02 (6th Cir. 1994)

*Sexton v. Cernuto*, 18 F. 4th 177, 184 (6th Cir. 2021)

*Southerland v. Michigan Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir. 2003).

IV. Conclusion ........................................................................................................30

## I.    INTRODUCTION

This case arose in 2017 and 2018 when Defendants undertook a faculty search to fill a position in the University of Cincinnati Biological Sciences Department. Although the faculty search committee identified Dr. Mark Charlton Perkins as the most suitable candidate for the position, refused to hire him and directed the search committee to focus on female candidates instead. When the search chair protested what she saw as a discriminatory decision, Defendants accused of bias affecting the search, and hastily terminated the all-but complete faculty search to hide their focus on the gender of the candidates during the hiring decision making.

Defendants ask this Court to accept as undisputed fact their claim that the repeated statements by decisionmakers and department faculty expressing preference for the female candidates were merely an offhanded convenient references to the candidates which were not intended to display either discriminatory animus against a male candidate or preference for female candidates. (*See, e.g.,* Def. MSJ Doc. 50, PageID 1622 at FN4). This is precisely the decision that must be made by a jury. Drawing the benefit of all inferences and credibility determinations in Plaintiff's favor for summary judgment, one cannot reasonably conclude that Dr. Charlton-Perkins' gender was not a but-for cause for the decision not to hire him, not just because of circumstantial evidence, but also because Defendants statements constitute probative evidence that Dr. Charlton-Perkins' gender was a factor in the decision not to hire him.

## II.    STATEMENT OF FACTS

### A. Dr. Charlton-Perkins's Educational and Professional Background.

Dr. Mark Charlton-Perkins is a PhD cell biologist and researcher.  He spent several years working at the Cincinnati Children's Hospital Medical Center until attending

1

graduate school at the University of Cincinnati and receiving his PhD in Molecular and Developmental Biology in 2014. (Deposition of Dr. Mark Charlton-Perkins ("Charlton-Perkins Dep.") Doc. 27 PageID 151-2).  After receiving his PhD., Dr. Charlton-Perkins took a position as a Research Associate at the University of Cambridge in the United Kingdom. (*Id*. at PageID 154; Exhibit A, Doc. 27-1, PageID 275).

Because of his work in Cincinnati, Dr. Charlton-Perkins had many professional connections to the University of Cincinnati and the CCHMC biological sciences community and continued to collaborate and communicate with his colleagues in Cincinnati while at Cambridge. (Charlton-Perkins Dep. Doc. 27, PageID 221-4). Specifically, he continued to work with his thesis advisor, Dr. Tiffany Cook and with Dr. Cook's primary collaborator, Dr. Elke Buschbeck. (Charlton-Perkins Dep. Doc. 27, PageID 155; Deposition of Dr. George Uetz ("Uetz Dep.") Doc. 29, PageID 436). In 2017, Dr. Buschbeck and Dr. Charlton-Perkins published two papers that they had coauthored. (Charlton-Perkins Dep. Doc. 27, PageID 215; Exhibit A, Doc. 27-1, PageID 275; Uetz Dep. Doc. 29 PageID 436; Deposition of Elke Buschbeck ("Buschbeck Dep.") Doc. 31, PageID 923). The two are "reasonably good" friends and maintained a friendly social relationship in addition to their collaboration. (Charlton-Perkins Dep. Doc. 27, PageID 210; Buschbeck Dep. Doc. 31, PageID 933)).

### B. The UC Biology Department Job Opening, the Composition of the Committee, and the General Procedure of the Candidate Search Process.

The Biological Sciences Department is a department of the University of Cincinnati College of Arts and Sciences. The department is an academic unit covered by the University's collective bargaining agreement with its AAUP chapter. (Uetz Dep. Doc. 29, PageID 392-396, 462; Deposition of Bruce Jayne ("Jayne Dep.") Doc. 45, PageID 1484;

Deposition of Margaret Hanson ("Hanson Dep.") Doc. 47, PageID 1527; Buschbeck Dep. Doc. 31, PageID 795). The Department conducted faculty searches on an annual basis based on their staffing needs. (Uetz Dep. Doc. 29, PageID 402). The Collective Bargaining Agreement terms controlled the department's hiring processes. (Hanson Dep. Doc. 47, PageID 1526-27; Uetz Dep. Doc. 29, PageID 396, 451; Buschbeck Dep. Doc. 31, PageID 795; Deposition of Bruce Jayne ("Jayne Dep") Doc. 45, PageID 1484-5). Per the CBA, "[t]he appointment of a Faculty Member to an Academic Unit shall normally be based on a recommendation initiated within and approved by the Faculty of that Academic Unit using procedures developed within the Academic Unit." (Deposition of Elke Buschbeck ("Buschbeck Dep.") Doc. 31 PageID 795; Collective Bargaining Agreement §6.2.2, Exhibit 25, Doc. 31-1, PageID 1012, Uetz Dep. Doc. 29, PageID 494).

When a department decides to conduct a faculty search, the Department Head appoints a search committee from the faculty of the department (Uetz. Dep. Doc. 29, PageID 403, 408, 410-411; Petron Dep. Doc. 49, PageID 1565; Buschbeck Dep. Doc. 792-796). The search committee is responsible for conducting the search through each of its phases: drafting the job posting; consulting and liaising with the Office of Equal Opportunity; collecting and reviewing applications; preparing a "short list" of nine to twelve preferred candidates; arranging and conducting multiple rounds of interviews; and ranking the final candidates in order of hiring priority. (Uetz Dep. Doc. 29, PageID 408, 410-411; Buschbeck Dep. Doc. 31, PageID 789-790). When the search committee had identified the preferred candidate for the position, its decision was passed to administration, first to the Department Head, and then to the Dean of the College of Arts and Sciences for final approval. Typically, the administration followed the search committee's decision. (Buschbeck Dep. Doc. 31, PageID 792).

### C.  The 2017 Cell Biologist Search

In 2017, the University of Cincinnati's Biological Sciences Department identified a need for a new faculty member to teach in the areas of cell biology and cell physiology and initiated a search to hire a new Assistant Professor to fill that role. (Uetz Dep. Doc. 29, PageID 401-404; Exhibit 1, Doc. 29-1, PageID 601). The department sought a cell biologist who could be productive in research and who complement the work of existing faculty members working in that area. (Uetz Dep. Doc. 29, PageID 404; Deposition of Dennis Grogan ("Grogan Dep") Doc. 33, PageID 1095).

Dr. George Uetz, the Department Head for the Biological Sciences Department, organized a search committee to conduct the search to fill the new position. (Uetz Dep. Doc. 29, PageID 392). Because of the size and breadth of the biological sciences department, an effort was made to select members who had some knowledge of cell biology or who were in similar academic fields. (Buschbeck Dep. Doc. 31, PageID 793.) The search committee was composed of four faculty: Elke Buschbeck as the search committee Chair; Dennis Grogan, who was a full professor and whose academic expertise was similar to cell biology; Josh Gross, who was an associate professor with tenure; Joshua Benoit, who was an assistant professor; and a graduate student, who served as a non-voting member of the committee. (Uetz Dep. Doc. 29, PageID 406-407; Buschbeck Dep. Doc. 31, PageID 789; Grogan Dep. Doc. 33, PageID 1094-96; Deposition of Joshua Benoit ("Benoit Dep.") Doc. 35, PageID 1150-51; Deposition of Josh Gross ("Gross Dep.") Doc. 39, PageID 1290-91).

### D. Dr.  Charlton-Perkins'  Participation  in  the  Search  Process: Preliminary Screening, Skype Interviews.

The committee was charged with the search on September 13, 2017. (Buschbeck Dep. Doc. 31, PageID 798, Exhibit 3, Doc. 29-3, PageID 634-6). The committee refined and approved the job search advertisement and distributed the posting to nearly a dozen academic associations to find potential candidates. (*Id.*) The job posting was also distributed directly to potential candidates, including former students and collaborators suggested by faculty members. (*Id.*) Among these specific candidates who were suggested was Dr. Charlton-Perkins, who Dr. Buschbeck contacted by email, inviting him to apply for the Assistant Professor position. (Charlton-Perkins Dep. Doc. 27 PageID 163).

### E. Office of Equal Opportunity, Diversity and Conflict of Interest Concerns.

On September 18, 2017, the search committee met with Marilyn Kershaw, a representative of the Office of Equal Opportunity ("OEO") who was assigned to the College of Arts and Sciences, and, by extension, the Biological Sciences department. (Deposition of Marilyn Kershaw ("Kershaw Dep.") Doc. 41 PageID 1352). Ms. Kershaw was responsible for ensuring that the search committee was complying with state, federal, and university laws, regulations, rules, policies and procedures in conducting the search, and if any concerns about the equity or fairness of the search, including conflict-of-interest concerns arose, Ms. Kershaw was the first person after the committee chair to deal with those concerns. (Kershaw Dep., Doc. 41, PageID 1353-4; Uetz Dep. Doc 29, PageID 437; Buschbeck Dep. Doc. 31 PageID 903).

### F. Dr. Charlton-Perkins' Participation in the Search Process: Preliminary Screening, Skype Interviews.

At Dr. Buschbeck's invitation, Dr. Charlton-Perkins submitted his application for the cell biologist position. He made it past the first round of cuts. (Charlton-Perkins Dep. Doc. 27, PageID 165; Exhibit 26, Doc. 31-2, PageID 1017; Exhibit 27, Doc. 27, PageID

1018). Soon thereafter, on December 5, 2017, Dr. Charlton-Perkins was notified that he had also made it past the second round of cuts and would be part of the first round of interviews. (MCP Dep. Doc. 27, PageID 169). On December 12, 2017, Dr. Charlton-Perkins participated a Skype interview with the search committee. (MCP Dep. Doc. 27, PageID 170).

At this time, because Dr. Charlton-Perkins was among the final dozen candidates, Dr. Buschbeck contacted Ms. Kershaw to ensure that her past collaboration with him would not create a conflict-of-interest issue. (Buschbeck Dep. Doc. 31, PageID 858-61; Exhibit 3, Doc. 29-3, PageID 639-640). Ms. Kershaw responded to Dr. Buschbeck that: "I would not say that it is a conflict of interest as it can be expected that faculty may know one another in the discipline. Let the committee members know your connection to the candidate and proceed as you would with any other finalist. Thanks." (Buschbeck Dep. Doc. 31, PageID 859-61; Exhibit 3, Doc. 29-3, PageID 639-640).

At Ms. Kershaw's instruction, Dr. Buschbeck disclosed to the committee that Dr. Charlton-Perkins was a student of her main collaborator, Dr. Tiffany Cook, and that the they had collaborated in that capacity. (Buschbeck Dep. Doc. 31, PageID 859; Uetz Dep. Doc.29, PageID 438-9; Exhibit 3, Doc. 29-3, PageID 639-640). Dr. Buschbeck solicited questions or concerns from the committee, but no members of the committee raised any objections or complaints about the collaboration or about Dr. Buschbeck continuing the search as the chair. (Buschbeck Dep. Doc. 31, PageID 860, 884). Dr. Buschbeck also notified Dr. Uetz of her past collaboration with Dr. Charlton-Perkins, who did not raise any further objections. (Uetz Dep. Doc. 29, PageID 443-444).

## G. Dr. Charlton-Perkins Attends On-Site Interviews

On December 18, 2017, the search committee notified Dr. Charlton-Perkins that he was among the final five candidates for the Assistant Professorship position and was invited for an on-campus interview. (Charlton-Perkins Dep. Doc. 27, PageID 174). Dr. Buschbeck provided the CV's and bios of each of the remaining campus to the faculty. Dr. Charlton-Perkins' CV listed his education and work at the University of Cincinnati, and his collaborations with Dr. Cook and Dr. Buschbeck. (Exhibit 27, Doc. 31-3, PageID 1018; Exhibit 28, Doc. 31-4 PageID 1019-23). Dr. Buschbeck received feedback from on the candidates which expressed a preference for a female candidate, regardless of the relative merit of the other candidates. (Buschbeck Dep. Doc. 31, PageID 837-843, 865—868; *See, e.g.,* Exhibit. 29, Doc. 31-5; PageID 1024; Exhibit 30, Doc. 31-6, PageID 1027-28).

 Four of the remaining candidates including Dr. Charlton-Perkins, accepted the committee's invitation to interview in-person. (Buschbeck Dep. Doc. 31, PageID 845-46; 879). The other three candidates who accepted the invitation were a man, Eugene Shirakov, and two women, Orly Levitan, and Eve Schneider. The interviews were conducted in late January/early February and consisted of an involved, multi-day program. (Charlton-Perkins Dep. Doc. 27 PageID 174-175; Exhibit 3, Doc. 29-3 PageID 642-43). Candidates attended multiple meetings and interview sessions, during which they met with the search committee, the Department Head, faculty and graduate students in the Biology Department, among others. (*Id.*) Candidates also prepared and presented a seminar based on their research during the onsite visit. At the conclusion of each candidate's visit, the faculty were afforded the opportunity to provide comments and feedback on each candidate. (Buschbeck Dep. Doc. 31, PageID 878; Exhibit 3, Doc. 29-3, PageID 643; Uetz Dep. Doc. 29, PageID 461). Dr. Charlton-Perkins' on-site interview took

place in the first week of February. (Charlton-Perkins Dep. Doc. 27, PageID 174; Exhibit 30, Doc. 31-6, PageID 174-175).

### H. The Search Committee Votes on the Hiring Priority of the Candidates

After on-site interviews for the four remaining candidates, Dr. Buschbeck collected and collated faculty feedback for the interviews, and on February 16, 2018, provided the search committee with copies of the comments about each candidate. (Buschbeck Dep. Doc. 31, PageID 867-879; Exhibit 6, Doc. 29-6, PageID 652-656; Exhibit 34, Doc. 31-10, PageID 1053-1056; Exhibit 35, Doc. 31-11, PageID 1057-1060). Many comments expressed concern about the perceived lack of diversity of the male candidates. (*See e.g.,* Doc. Exhibit 34, Doc. 31-10; PageID 1053-1056; Exhibit 35, Doc. 31-11, PageID 1057-1060). The search committee met on February 21, 2018, to vote on the hiring priority of the remaining four candidates. (Buschbeck Dep. Doc. 31, PageID 871; Exhibit 3, Doc. 29-3, PageID 643-44). Dr. Uetz was present during this meeting as an observer. (Buschbeck Dep. Doc. 31, PageID 879-882; Uetz Dep. Doc. 29, PageID 556). Each of the search committee members had selected a different candidate as their top choice for the position and used the meeting plead a case for their preferred candidates. (Buschbeck Dep. Doc. 31, PageID 880; Uetz Dep. Doc. 29, PageID 432, 556). During their discussions it was determined that Dr. Shirakov was the least preferred candidate. (Buschbeck Dep. Doc. 31 PageID 880-881). Dr. Buschbeck dismissed the committee meeting without conducting the final vote and asked each member to submit their final rankings after due consideration. (Buschbeck Dep. Doc. 31, PageID 881-83).

On February 23, 2018, the search committee members sent Dr. Buschbeck their final votes. Three of the committee members ranked Dr. Charlton-Perkins at number 1,

while the fourth, Dr. Gross, ranked favor of Dr. Schneider first. (Buschbeck Dep. Doc. 31, PageID 883). Upon receiving the final vote, Dr. Buschbeck passed the results of the search committee's deliberations on to Dr. Uetz and notified him that the committee had decided with a 3-1 vote that Dr. Charlton-Perkins was the final decision of the search committee. (Buschbeck Dep. Doc. 31, PageID 886; Uetz Dep. Doc. 29, PageID 432, 529). Up to this point, no complaints or concerns had been raised to Dr. Buschbeck about the conduct of the search, any potential conflicts of interest, or Dr. Buschbeck's behavior as the chair of the committee. (Buschbeck Dep. Doc. 31, PageID 885; Uetz Dep. Doc. 29, PageID510). At this time, Dr. Uetz was already aware of Dr. Buschbeck's work with Dr. Charlton-Perkins and knew that she had cleared this relationship with Mr. Kershaw. (Uetz Dep. Doc. 29, PageID 437).

### I. Dr. Uetz and Dean Ken Petron Make the Decision to Not Hire Dr. Charlton-Perkins.

After Dr. Buschbeck reported the committee's final 3-1 vote in favor of Dr. Charlton Perkins to Dr. Uetz, two faculty members, Dr. John Layne and Dr. Stephanie Rollman approached him to complain that they felt Dr. Buschbeck had not conducted a fair search. (Uetz Dep. Doc. 29, PageID 434). Dr. Rollman thought that Dr. Buschbeck should have recused herself from the search process. (Uetz Dep. Doc. 29, PageID 435). Dr. Layne emotionally stated that he felt Dr. Buschbeck had attempted to bias the search in Dr. Charlton-Perkins' favor because they were friends. (Uetz Dep. Doc. 29, PageID 435). Dr. Layne had not raised these concerns when he reviewed Dr. Charlton-Perkins' CV during the search process, but he did comment that Dr. Charlton-Perkins "would not provide much-need increase in diversity. Diversity statement is meh." (Exhibit 30, Doc. 31-6, PageID 1028).

Dr. Uetz took the search committee's final decision to Dean Petron on February 27, 2018. (Uetz Dep. Doc. 29, PageID 429). Over two meetings, one on February 27, 2018, and the other on March 2, 2018, the two reviewed the search committee's recommendation, as well as faculty comments, graduate comments, search committee comments, and Dr. Uetz's personal notes. (Uetz Dep. Doc. 29, PageID 486). Dr. Uetz sought "guidance" as two questions: whether to "advance a female candidate over a male candidate in this circumstance," and what to do about allegations of advocacy for one candidate by the search chair. (Petron Dep. Doc. 49, PageID 1588; Uetz Dep. Doc. 29, PageID 534). Dr. Petron recommended that they instead "focus on the two women candidates." (Uetz Dep. Doc. 29, PageID 529; Exhibit 13, Doc. 29-13, PageID 728).

### J. March 8, 2018, Faculty Meeting and the Decision to Cancel the Search.

After his March 2, 2018, meeting with Dean Petron, Dr. Uetz notified the search committee by email that he and Dean Petron would not be following their recommendation to hire Dr. Charlton-Perkins:

> Colleagues – After receiving your recommendations, I discussed the candidates and our hiring strategy with the dean. Based on multiple factors, Ken [Petron] recommended that the most appropriate course of action was to focus on the women candidates first. Given the initial tied rankings and our department's current situation, Ken feels he might be able to make a case to hire two strong women candidates. Since that was also something the committee discussed, and with Ken's support, I think it is worth pursuing that option.

> While I can't be certain of the outcome when Ken makes the case to the Provost, I think would be wise to contact Eve Schneider and Orly Levitan to determine their availability and continued interest. Given rumors of potential job offers, we'll need that information to move forward, so I will attempt to contact them this week.

(Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 753-54). Instead of accepting Dr. Uetz and Dean Petron's directive to "focus on the women candidates," Dr.

Buschbeck replied to Dr. Uetz on March 5, 2018, questioned why Dr. Uetz was "going against the very clear recommendation of the committee," and pushing back against "plain discrimination." (Buschbeck Dep. Doc. 31, PageID 894; Uetz Dep. Doc. 29, PageID Exhibit 19, Doc. 29-19 PageID 753-54). In response, on March 5, 2018, Dr. Uetz sent a second email, articulating a six-point explanation for the decision not to follow the search committee's recommendation:

1) Search committees are advisory to the head. Your advice and discussion of candidate strength and weaknesses, along with my own judgment and extensive discussions with the dean, has guided the choice of actions.
2) The committee's recommendation was not unanimously; one faculty member and the grad student representative both recommended [Eve] Schneider over Charlton-Perkins.
3) The department faculty responses were mixed, but overall were slightly in favor of Schneider, who had the highest average score, the most top scores, and the least lowest scores. Both female candidates had higher average scores than Charlton-Perkins.
4) Position offers are made by the dean, and the head must make the case for a specific candidate, after review and discussion of the entire search procedure.
5) When candidates are equally qualified – which everyone agreed upon, even though each of you had a different initial preference-the head would need to make the case why a male candidate should be hired over a qualified female candidate. In this situation, to choose a female candidate over a male is not illegal, as Elke [Buschbeck] asserts.
6) After extensive review and discussion (two meetings, a phone call and several emails), Ken and I felt it best to pursues one or both of the female candidates. Given the pros and cons of their interviews, we decided upon Schneider as a first choice.

(Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 752-53). After Dr. Buschbeck responded and challenged Dr. Uetz's assertion that the committee had ranked the candidates as equally qualified, ("A 3 out of 4 support among the faculty committee members is actually a very clear recommendation."), Dr. Petron offered to meet with Dr. Buschbeck to discuss: "I can offer to discuss more if you think it would help. I don't want you to think this is just George behind this decision." (Uetz Dep. Doc. 29, PageID 559-61;

Exhibit 19, Doc. 29-19 PageID 749-750). The same day Dr. Uetz spoke with Dr. Buschbeck in the faculty office and told her for the first time that he had received concerns about how she had conducted the search. (Buschbeck Dep. Doc. 31, PageID 899). Dr. Buschbeck addressed the concerns the following day at a faculty meeting and assured the department that she had spoken with Marilyn Kershaw about her collaboration with Dr. Charlton-Perkins. (*Id.,* Exhibit 17, Doc. 29-17, PageID 740).

On March 8, 2018, Dr. Buschbeck met with Dean Petron and Associate Dean Margaret Hanson to further discuss the search. Dr. Buschbeck recorded her notes of the conversation the following day on March 9, 2018. (Buschbeck Dep. Doc. 31, PageID 904-5; Exhibit 39, Doc. 31-15, PageID 1064). Dr. Buschbeck assured Dean Petron that she had closely followed Ms. Kershaw's instructions to avoid a COI. (Buschbeck Dep. Doc. 31, PageID 902-4; Exhibit 39, Doc. 31-15, PageID 1064). Dean Petron told her that it did not matter, because there was a "perceived" conflict of interest and said that this was "one of the reasons" he decided not follow the search committee's vote. (Buschbeck Dep. Doc. 31, PageID 902-5; Exhibit 39, Doc. 31-15, PageID 1064-5.). Dean Petron told Dr. Buschbeck that the other reasons were that the "candidates are very close, and since Biology is short on women, that he thought that it would be better to go with a female candidate." (*Id.*) Dr. Petron did not remember which of the two female candidates would be offered the job, in part because he "has not yet really looked at their CV very closely, and that he intended to do that at a later time." (Buschbeck Dep. Doc. 31, PageID 902-4; Exhibit 39, Doc. 31-15, PageID 1065).

**K. March 20, 2018, Faculty Meeting and the Decision to Cancel the Search.**

On March 20, 2018, Dr. Petron and Dr. Uetz met with the Biology Department and informed the department that the job search was cancelled, citing the fact that Dr. Buschbeck had publications with Dr. Charlton-Perkins. (Uetz Dep. Doc. 29, PageID 482, 528; Exhibit 7, Doc. 29-7, PageID 658-9). Dean Petron's announcement was met with confusion by the staff. Multiple faculty members were voiced surprise and confusion at both the decision to cancel the search, and the Dean Petron's claimed rationale for doing so. (Exhibit 7, Doc. 29-7, PageID 660, 61, 664) ("No. But by accepting what she—Elke did the right thing, to approach your office; a member of your office gave her the green light to go ahead with it. [] Why don't you take responsibility and say I support the people that work in my office and I'm going to stand by my office and let the search go ahead?"); *Id.* at 670. ("If It's –If it's possible for one department to have co-authors and no problem, then it seems ludicrous that we have to cancel a search because of that. And it was absolutely clear for anyone who read the CVs of the four candidates, absolutely clear. I mean, this person's from Children's Hospital here in Cincinnati. It was absolutely clear to anyone who read these things that Elke had published. This was not secretive at all. Way open, okay." )

When questioned on the decision-making process, Dr. Uetz explained that he and Dean Petron reviewed the search committee's 3-1 recommendation, "And I mentioned – I -I asked specifically, in particular, here we have a male candidate who was recommended by the search committee. And very close behind we have two, two female candidates. And I need guidance on what do you do with that? Because our department is bereft of female candidates. Do I advance a female candidate over a male candidate in this circumstance? And Ken and I talked about it." (Exhibit 7, Doc. 29-7, PageID. 660)

13

Ultimately, despite the objections of the faculty, Dean Petron and Dr. Uetz rejected the proposals to cure the alleged bias in the search and stood firm in their decision to cancel the search. Dr. Uetz notified Dr. Charlton-Perkins that they had decided to cancel the search on March 27, 2018, a week after the faculty meeting. (Doc. 27 PageID 184, Ex. J, Doc. 27-10 PageID 303).

## III. LAW AND ARGUMENT

### A. Standard of Review

As the party moving for summary judgment, Defendant bears the burden of showing the absence of a genuine issue of material fact as to at least one element of Plaintiff's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). This Court must accept Plaintiff's evidence as true and draw all reasonable inferences in his favor, viewing all facts and inferences drawn therefrom in the light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *DePiero v. City of Macedonia,* 180 F.3d 770, 776 (6th Cir. 1999). When ruling on summary judgment, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 151 (2000).

### B. Title IX and Equal Protection

#### 1. Extraterritoriality

At the outset, Plaintiff must address a threshold issue raised by Defendants, namely, that Title IX does not apply to the University of Cincinnati for discriminatory decisions the university made in Cincinnati, Ohio, because the plaintiff was living in the United Kingdom at the time. The present case does not require the court to apply any extraterritoriality analysis because the hiring decision at issue was made within the

United States by an indisputably covered entity. Defendants' interpretation of Title IX is patently absurd and finds no support in the law. The relevant determination under Title IX is whether "victims are effectively denied equal access to an institutions resources and opportunities." *Davis v. Monroe County Bd. Of Ed.,* 526 U.S. 629, 631, 119 S.Ct. 1661 (1999). All relevant factual circumstances and acts, institutions, resources, and opportunities at issue in this matter are situated occurred in the United States. And to the extent that this argument is even plausible—which Plaintiff disputes—it should have been raised in Defendants' Motion to Dismiss.

Contrary to Defendants' characterization of the Department Education Office of Civil Rights Rulemaking document they rely upon, the rule and the case law cited in the document concern only acts of discrimination that occur entirely *outside* the United States. The rule articulated in the OCR document, and, more importantly, the rules articulated in the cases cited therein, *King v. Bd. Of Control of Mich. Univ.* and *Phillips v. St. George's University*, concern discrimination that occurred in study-abroad educational programs in foreign countries. *Phillips,* 2007 WL 3407728 (Title IX did not apply extraterritorially to complaint of sexual assault which occurred at defendant University's program in *Grenada*); *King*, 221 F.Supp. 2d. 783 (Title IX applied extraterritorially to complaints of sexual harassment in university program in Cape Town, *South Africa*). The extraterritoriality rule is inapplicable to this case because it occurred in Cincinnati, Ohio, not Grenada or South Africa. Defendants' argument finds no support in the law, they are undoubtedly subject to Title IX.

**2. There are Genuine Issues of Material Fact Regarding Plaintiff's Title IX and Equal Protection Claims.**

Defendants argue that Plaintiff cannot establish his claims for Title IX and Equal Protection because he cannot establish that they decided not to hire him because of his gender, rather than because of complaints that Dr. Buschbeck had biased the search. But there are ample facts on the record from which a jury could find that Defendants refused to hire Dr. Chalrton-Perkins because of his gender.

Title IX and 42 U.S.C. §1983 claims borrow their analytical framework from Title VII claims. *Weburg v. Franks,* 229 F.3d 514, 522 (6th Cir. 2000); *Ivan v. Kent State University,* 92 F.3d 1185 (Table), 1996 WL 422496 at *2. "A plaintiff alleging sex discrimination may establish [his] claim either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Raadschelders v. Columbus State Community College,* 377 F.Supp.3d 844, 856 (S.D. Ohio 2019).

When the plaintiff has established his *prima face* case of discrimination, the burden shifts directly to the employer to proffer its legitimate, non-discriminatory reason for the employment decision. *White v. Columbus Metropolitan Housing Authority*, 429 F.3d. 232,238 (6th Cir. 2006).  Similarly, if the plaintiff produces direct evidence of discrimination, the burden shifts the burden shifts "to the employer to show that it would have taken the employment action of which the plaintiff complains even in the absence of discrimination." *Id.* (citing *Seay v. Tenn. Valley Auth.* 339 F.3d 454, 463 (6th Cir. 2003)).  Under either approach, "If the defendant is able to meet this burden, the plaintiff must establish that the defendant's stated reason is mere pretext for its true discriminatory motives." *Id.*  Here, the record is replete with both direct and circumstantial evidence that Defendants discriminated against Plaintiff.

### a.  Direct Evidence of Discrimination

16

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (citing *Seay v. Tenn. Valley Auth.* 339 F.3d 454, 463 (6th Cir. 2003)). This case presents one of the "rare cases where there is direct evidence from the lips of the defendant[s]" that Plaintiff's gender was a motivating factor in the decision not to hire him. *Weberg v. Franks,* 229 F.3d 514, 523 (6th Cir. 2000). The record is rife with direct evidence of discrimination:

- When Dr. Uetz brought the committee's 3-1 recommendation to Dean Petron he explained: "I -I asked specifically, in particular, here we have a male candidate who was recommended by the search committee. And very close behind we have two, two female candidates. And I need guidance on what do you do with that? Because our department is bereft of female candidates. Do I advance a female candidate over a male candidate in this circumstance? And Ken and I talked about it." (Exhibit 7, Doc. 29-7, PageID. 660; *See also,* Petron Dep. Doc. 49, PageID 1588; Uetz Dep. Doc. 29, PageID 487, 534).

- Dr. Uetz's email on March 4, 2018, to the search committee confirmed that he and Dr. Petron had rejected the search committee's vote, and that Dr. Charlton-Perkins was not being considered for the position. (Exhibit 19, Doc. 29-19 PageID 753-54). Instead, Dr. Uetz and Dr. Petron had decided to "focus on the women candidates." (Uetz Dep. Doc. 29, PageID 429, 559-61; Exhibit 19, Doc. 29-19 PageID 753-54). Despite referencing "tied rankings" for the "equally qualified" candidates, Dr. Uetz and Dean Petron paid no consideration to Dr. Charlton-Perkins or the other male candidate, Eugene Shakirov. (Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 753-54; Buschbeck Dep. Doc. 31, PageID 880).

17

- When Dr. Buschbeck raised the issue of discrimination, Dr. Uetz justified this decision because "[w]hen candidates are equally qualified –which everyone agreed upon, even thought each of you had a different initial preference – the head would need to make a case why a male candidate should be hired over a qualified female candidate," and "Ken and I felt it best to pursue one or both of the female candidates. Given the pros and cons of their interviews, we decided upon Schneider as a first choice." (Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 752-53).

- Both Dr. Uetz and Dr. Petron testified that they considered the gender balance of the department during their deliberations. (Uetz Dep. Doc. 29, PageID 535; Petron Dep. Doc. 41, PageID 1587, 1592-93, 1598). Dr. Uetz testified:

> "Q: So to what extent did gender balance in the department have any bearing on who was to be the appropriate candidate?
>
> A: It—It was in the mix. That's –We looked at all—
>
> Q: It was in the mix; is that your answer?
>
> A: It was in the mix.

(Uetz Dep. Doc. 29, PageID 535). Defendants cannot consider the gender balance of the Department without factoring in the gender of the candidates.

- Dean Petron stated to Dr. Buschbeck, that "since Biology is short on women, that he though that it would be better to go with a female candidate." (Exhibit 39, Doc. 31-15, PageID 1064).

Based on these statements by the decisionmakers favoring women and admitting to considering gender during the decisionmaking process, a jury could believe that Defendants discriminated against Dr. Charlton-Perkins.

### b. Circumstantial Evidence of Discrimination and the *Prima Facie* Case

18

Plaintiff can also make his case by circumstantial evidence. The Plaintiffs' burden to establish his *prima facie* case is generally satisfied upon a showing of "action taken by the employer from which one can infer, if such action remains unexplained, that it is more likely than not that such actions were based on a discriminatory criterion . . .". Plaintiff's burden to establish his *prima facie* case is not an onerous burden.

Here, Defendants do not substantively dispute the that Dr. Charlton-Perkins was qualified for the position, nor do they dispute that he suffered an adverse employment decision. Instead, Defendants argue that, as a male, Dr. Charlton-Perkins cannot establish circumstances suggesting intent to discriminate against the majority (men) and cannot demonstrate that the job search was cancelled in order to discriminate against him. Defendants, however, ignore the evidence in the record that clearly establishes both elements.

### i. Defendants' discriminatory comments regarding hiring a woman meet the heightened standard for reverse-discrimination.

To satisfy the first element of the *prima facie* case, a male plaintiff must establish "background circumstances must support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Turner v. Grande Pointe Healthcare Community*, 631 F.Supp.2d 896, 910-911 (N.D. Ohio 2007) (quoting *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir. 1985)). Here, the record shows that present case took place in the context of a Biological Sciences Department that had recently experienced a "mass-exodus" of female tenure-track professors, and was deeply invested in hiring a female candidate, regardless of the relative merits of the male candidates.

In addition to the decisionmakers' explicit admissions, detailed in the previous section, these is ample evidence establishing such circumstances. Multiple faculty submitted feedback on the candidates which expressed an explicit preference for a female candidates over any male candidates:

• Dr. Jayne "strongly favor[ed] giving the nod to a female applicant given the recent mass exodus we have had of tenure-track women in our department in tenure-track position." (Doc. 29-6, PageID 654).

• Dr. Layne criticized Dr. Charlton-Perkins: "would not provide much-need increase in diversity. Diversity statement is meh." (Exhibit 30, PageID 31-6, PageID 1028).

• Dr. Stephen Matter did not even consider the male candidates, noting in his comments next to each male candidate simply, "male," and commenting "I don't think we could in any good conscious, [sic] make an offer to a white male over any female qualified candidate given the current gender bias in our department. . ." (Exhibit 29, Doc. 31-6, PageID 1024).

Beyond these loud voices, the gender diversity of the candidates was a consistent theme in faculty and grad student feedback of the candidates during the search process. For example:

• Dr. Lucinda Lawson: Charlton-Perkins "Values diversity but is not himself diverse," Levitan and Schneider "Great for diversity and grad recruitment, strong female role model for undergrads and grads," and, "[g]ood for diversity," respectively. (Exhibit 36, Doc. 31-12, PageID 1061)

• Charlton-Perkins "does not contribute to the diversity that our department needs."(Exhibit 34, Doc. 31-10 PageID 1056)

- Graduate Student comments that Schneider and Levitan "add some female diversity to the department," and were "great for diversity" respectively. (Exhibit 35, Doc. 31-11 PageID 1057-1059)

Dr. Uetz himself had referenced the "underutilization" for women faculty in the department as early as the beginning of the search October 20, 2017, while exploring an opportunity hire. (Exhibit 4, Doc. 29-4, PageID 647), and obliquely justified his stated concern about hiring a man because "political climate of the United States of America had changed during [his] headship and [] there was a lot of rumor, gossip, and political posturing regarding affirmative action." (Uetz Dep. 29, PageID 431).

It is clear from these statements in the record that many faculty in the Biological Sciences department were invested in the possibility of hiring a female candidate over the male. These background circumstances, coupled with the explicit comments made by Dr. Uetz and Petron, give rise to at the very least a suspicion that Defendants discriminated against the majority and are undoubtedly sufficient to establish the first element of the *prima facie* case.

### ii. Defendants decided to cancel the job search to avoid liability for their discriminatory acts.

Plaintiff may establish the fourth element of his *prima facie* case by demonstrating that Defendants failed to hire him because of his gender, and that they cancelled the position as part of the discriminatory scheme. *Charlton-Perkins v. Univ. of Cincinnati, et al.* No. 21-3840 at *11 (6th Cir. June 3, 2022); *See also Moore v. Abbott Laboratories*, 780 F.Supp.2d 600, 618 (S.D. Ohio 2011). Here, there is ample evidence that Defendants refused to hire Plaintiff due to his gender. (*See,* Direct Evidence, Circumstantial Evidence, (b)(2), *Supra*.)  It is no less clear that the to cancel the search was made to avoid potential

liability for discrimination after disregarding the search committee's decision in favor of Plaintiff. During the faculty meeting announcing the cancellation, Dean Petron explained:

> KEN PETRON: Well, so –so were we. We were trying to say, let's –let's make an offer to someone. And then, frankly, the emails just started flying with a lot of accusations that can't be undone. And here's what happens, just so you guys know. [] Anyone in the search, let's say we offer Candidate A or B or C, whoever is not offered or anyone here that disagreed with one or the other or the other, any of these candidates could come back and – and file a lawsuit. And this happens all the time. You know, we settled one for about 250,000 in A&S. Couple months ago it was 120,000. They could come back and have a treasure trove of evidence to march out in front of – of a jury. We had a jury trial – two weeks ago."

 (Exhibit 7, Doc. 29-7, PageID 664; Petron Dep. Doc. 49, PageID 1582-84). The evidence that the search was cancelled to avoid liability could not be more explicit.

Dean Petron also raised a concern about being sued as early as March 8, 2018, meeting with Dr. Buschbeck: "He [Petron] further said that if there was an investigation, that then they would have to go though my email and 'who knows what they would find there.'" (Exhibit 39, Doc. 31-15, PageID 1064). The most notable of Dr. Buschbeck's emails, exchanged with Dr. Uetz regarding the decision to "focus on the female candidates," do not show any wrongdoing on Buschbeck's part, but rather, strong objections that the decision was "plain discrimination," and that "in this case "focusing on the woman candidates" is against what affirmative action wants us to do." (Buschbeck Dep. Doc. 31, PageID 894; Uetz Dep. Doc. 29, PageID Exhibit 19, Doc. 29-19 PageID 753-5).

A jury could conclude from these statements that Dr. Uetz and Dean Petron were morbidly concerned about potential liability and were uncomfortably aware that an investigation might unearth evidence—such as Dr. Uetz and Dr. Buschbeck's emails—that suggested they had acted discriminatorily. For these reasons, Dr. Charlton-Perkins can

establish the final element of the *prima facie* case, showing that the decision to terminate him, and the decision to cancel the search made with discriminatory motive.

### c. Pretext

When the employee has satisfied his *prima facie* case, or produced direct evidence of discrimination, the burden shifts to the employer to proffer a legitimate non-discriminatory reason for the adverse employment action, and then shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009). In the Sixth Circuit a plaintiff generally may do so by showing: " 1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* However, "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* at FN4.

According to Defendants, the decisions to not hire Dr. Charlton-Perkins and to cancel the position were forced upon them by a conflict-of-interest-tainted search and a schism within the department. But the record does not support that version of events. Instead, it shows overwhelmingly that concerns about gender predominated Defendants' decision not to hire the male candidate, Charlton-Perkins, and to cancel the search entirely to mask their discrimination..

And even if Defendants could plausibly demonstrate that consideration over COI was factored into their decisions, the law of Title VII—and by extension, Title IX and 42 U.S.C. §1983-- nevertheless remains clear: "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just

by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff 's gender was one but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton Cty. Georgia,* 140 S. Ct. 1731, 1739 (2020). There is ample evidence in the record from which a jury could conclude that Dr. Charlton-Perkins' gender was a determinative factor in the decision not to hire him, and not accept Defendants' proffered reason for the cancellation.

### i. Concerns about Gender Predominated the search.

Despite Defendants' arguments to the contrary, the record is replete with evidence that the gender of the candidates was a significant concern of the decisionmakers and the faculty. As discussed at length in the direct evidence section, *supra.* concerns about gender predominated the search from the outset. The record shows that the gender of the candidates was a concern of Dr. Uetz and department member as early as October 2017, when Dr. Uetz discussed an underutilization of female faculty in the Biology department. (Uetz Dep. Doc. 29, PageID 446; Exhibit 4, Doc. 29-4, PageID 647; Deposition of Margaret Hanson, Doc. 47, PageID 1526, 1529-30).

It must be noted concerns about "conflict of interest" was not a matter of discussion until after the search committee votes to hire Dr. Charlton-Perkins, when suddenly, the focus of the department shifted from hiring one candidate, to consideration of hiring two female candidates. Meanwhile, concerns about diversity and gender balance in the department were present in every stage of the search process. When Dr. Uetz deliberated with Dean Petron about "advance[ing] a female candidate over a male candidate in this circumstance," it was explicitly in the context of a department "bereft of female candidates." (Petron Dep. Doc. 49, PageID 1588; Uetz Dep. Doc. 29, PageID 534). And when Dr. Uetz wrote the search committee on March 4, 2018, he told them to "focus

on the women candidates first," and that "[g]iven the initial tied rankings and our department's current situation, Ken feels he might be able to make a case to hire two strong women candidates." (Exhibit 19, Doc. 29-19, PageID 753). To be clear, when Dr. Uetz sent this email, and his subsequent email questioning whether it would be improper to hire a male candidate female candidate, (*Id.* at PageID 752) no discussion of COI or unfair bias had occurred. But then, when Dr. Buschbeck objected to Dr. Uetz and Dean Petron's rejection of the committee's decision and called it discriminatory, Defendants raised COI issues.

### ii. Conflict of Interest was not a legitimate concern.

The conflict-of-interest justification cited by Defendants has no basis in fact. Defendants argue that they refused to hire Charlton-Perkins and cancelled the search because Dr. Buschbeck unfairly biased the search in his favor, and because faculty perceived a conflict of interest. A jury could readily disbelieve this argument based on the unremarkable nature of Dr. Buschbeck's collaboration with Dr. Charlton-Perkins, which was vastly insufficient to justify their actions.

Dr. Buschbeck's past collaboration with Dr. Charlton-Perkins was unremarkable in academia. Collaboration among academics in a particular scientific field is expected due to narrowness of fields of study and the desire to have field-experts on the search committee. (Kershaw Dep. Doc. 41, PageID 1377; Benoit Dep. Doc. 35, PageID 1165; Uetz Dep. Doc. 29, PageID 441; Buschbeck Dep. Doc. 31, PageID 853). Indeed, in a very previous search, which resulted in Dr. Annie Rowe's hiring, a search committee member not only knew the chosen candidate personally and had recently co-authored a paper with the second ranked candidate. (Buschbeck Dep. Doc. 31, PageID 852). No objection was perceived, and the search was completed without dispute.

Here, not only was there a post-*hoc* concern with a supposed COI, but the record demonstrates that Dr. Buschbeck's had vet and add complete transparency to the process by contacting the OEO and Marilyn Kershaw, who by all accounts was the proper individual. (Uetz Dep. Doc. 29, PageID 441; Jayne Dep. Doc. 45, PageID 1462). Dr. Buschbeck did not break any rule, regulation or procedure, or otherwise unfairly favor Dr. Charlton-Perkins. (; Buschbeck Dep. Doc. 31, PageID 907; Exhibit 7, Doc. 29-7, PageID 669) (Dr. Uetz stated in the faculty meeting that he "did not observe any conflict on Elke's part. And I, you know, I – and, as far as I'm concerned, her going to Marilyn for advice seemed appropriate, you know.")

Notably, the two most significant voices of criticism toward Dr. Buschbeck's management of the search, Drs. Layne and Jayne, "strongly favor[ed] giving the nod to a female applicant given the recent mass exodus we have had of tenure-track women in our department in tenure-track position." (Doc. 29-6, PageID 654). Dr. Layne criticized Dr. Charlton-Perkins: "would not provide much-need increase in diversity. Diversity statement is meh." (Exhibit 30, PageID 31-6, PageID 1028). Defendants cite six alleged complaints about the potential bias of the search. However, evidence of these complaints is secondhand and insubstantial. Although Bruce Jayne claimed that he was "stubborn and persistent" in bringing multiple complaints of malfeasance by Dr. Buschbeck to the attention of Dr. Uetz and Dean Petron, when pressed in his deposition, he could not recall an single instance when he allegedly did so. (Jayne Dep. Doc. 45, PageID 1460-65).

Defendants allude to a "schism" in the department over Dr. Buschbeck's conduct of the search, but there is scant evidence in the record that any concern about a COI existed before the search committee made a recommendation to hire Dr. Charlton-Perkins. Dean Petron's feeling about a rift in the Department is a frail evidentiary reed to

26

rely upon. (Def. MSJ, Doc. 50, PageID 1624). Indeed, the only substantive evidence in the record of a conflict within the department is that concerning Dr. Buschbeck's efforts to challenge what she considered to be unfair and discriminatory decision making.  Based on these facts, a jury could readily disbelieve Defendants' argument that conflict of interest, real or perceived, motivated their decision to refuse to hire Dr. Charlton-Perkins and then cancel the search.

### iii. The Decision to Disregard the Recommendation of the Committee and Cancel the Search was Highly Irregular.

Finally, a jury could find that Defendants' claimed conflict of interest was insufficient to motivate the decision to refuse to hire Dr. Charlton Perkins and to cancel the search. The decision to disregard the search committee's recommendation was highly unusual (Buschbeck Dep. Doc. 31, PageID 898), as was the decision to cancel the search, which meant significant wasted time, energy, and opportunity. (Kershaw Dep. Doc. 40 PageID 1355; Petron Dep. Doc. 49, PageID 1574, 1578; Benoit Dep. Doc. 35 PageID 1152). Indeed, it is not even clear that the CBA permits the hiring administrators to reject the committee's hiring decision. (Buschbeck Dep. Doc. 31 PageID 795; Collective Bargaining Agreement §6.2.2, Exhibit 25, Doc. 31-1, PageID 1012, Uetz Dep. Doc. 29, PageID 494). However, even so, accepting *arguendo* Defendants' arguments, there reamins no explanation why the alleged taint of bias could not be cured, short of cancelling the search. For example, Dr. Buschbeck offered to step aside, and submit a re-vote of the committee. (Buschbeck Dep. Doc. 31, PageID 975-76; Uetz Dep. Doc. 29, PageID 539). In fact, Defendants never re-ran, or attempted to provide an unbiased hiring process to the candidates.

The real explanation, which a jury could readily arrive at, is that, because Dr. Buschbeck had already complained about gender discrimination via discoverable emails, the search could not be completed in any form without exposing the University to potential liability. (*See, e.g.,* Exhibit 7, Doc. 29-7, PageID 664; Petron Dep. Doc. 49, PageID 1582-84)(" any of these candidates could come back and – and file a lawsuit. And this happens all the time. You know, we settled one for about 250,000 in A&S. Couple months ago it was 120,000. They could come back and have a treasure trove of evidence to march out in front of – of a jury.")

On this record, a jury could readily disbelieve that Defendants' proffered reason for their decisions not to hire Dr. Charlton-Perkins and cancel the search and find instead that Defendants made these decisions out of a discriminatory desire to hire a woman instead of a man and cancelled the search in order to effectuate and hide their discriminatory efforts.

### d. Dean Petron and Dr. Uetz Jointly Participated in the Decisions to not hire Dr. Charlton-Perkins and to Cancel the Search.

Finally, Defendants argue that Ken Petron was the only relevant decisionmaker in this matter and claim that he, and therefore the discriminatory decision to not hire Plaintiff, was completely insulated from any gender bias or discriminatory animus. However, this assertion is contrary to the testimony of both Dr. Petron and Dr. Uetz. In their own words, the two made the non-hire decision together, and together explicitly considered the gender of the candidates—specifically the female gender of the lower ranked candidates in so doing.

The record is replete with testimony from both Dean Petron and Dr. Uetz that they collaborated on the decision not to hire, deliberated together, and explicitly discussed

concerns of gender when they reviewed and rejected the search committee's recommendation to hire Dr. Charlton-Perkins (*See, e.g,* Petron Dep. Doc. 49, PageID 1575, 1590 )("Whether it was just me, or the two of us, hard to say.") (Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 749-750). And while Dean Petron claimed responsibility during his deposition for cancelling the search, when he presented the cancellation to the faculty, he framed it as a joint decision. (Exhibit 7, Doc. 29-7, PageID 662). Defendants argue that the decisions were made in a vacuum, but a jury could easily conclude from the record that Dean Petron and Dr. Uetz were to an equal degree involved in the decision-making process.

### C. 11th Amendment Immunity

Defendants argue that Plaintiff's claim for injunctive relief fails because Dean Petron and Dr. Uetz no longer hold their prior positions and lack the authority to grant the requested relief. In order to qualify for an exception under *Ex parte Young*, an action must seek prospective injunctive relief to end a continuing violation of federal law. *Carten v. Kent State Univ.,* 282 F.3d 391, 395 (6th Cir. 2002)*,* citing *McDonald v. Village of Northport Michigan,* 164 F.3d 964, 970-972 (6th Cir. 1999). In this Circuit, "claims for reinstatement to a job position are prospective in nature and an appropriate subject for *Ex parte Young* action." *Diaz v. Michigan Dep't of Corr.,* 709 F.3d 956, 964 (6th Cir. 2013). Despite Defendants' arguments that Dr. Uetz and Petron no longer have authority to grant the prayed for relief of reinstatement, the action is against Defendants in their official capacities. The right to reinstatement does not become unenforceable because the offending officials are no longer in office. The right to relief is enforceable against Dr. Uetz and Dean Petron's successors in office. *Brinkman v. Gilligan*, 610 F.Supp. 1288, 1289 at FN2 (S.D. Ohio 1985).

**D. Qualified Immunity**

Defendants argue that Dr. Uetz and Dean Petron have qualified immunity, in essence, because Plaintiff cannot maintain meritorious §1983 and Title IX claims. "Once the qualified immunity defense has been raised, the burden is on the plaintiff to establish both that 'the officer's conduct violated a constitutional right;' and that 'the right was clearly established.'" *Sexton v. Cernuto*, 18 F. 4th 177, 184 (6th Cir. 2021) (citing *Bunkley v. City of Detroit,* 902 F.3d 552, 559 (6th Cir. 2018)). Indeed, it is well-settled case law in this Circuit that gender discrimination and reverse gender discrimination is unlawful, and the cases so holding are legion. *See, e.g. Pierce v. Commonwealth Life Insurance Co.,* 40 F.2d 796, 801-02 (6th Cir. 1994) (citing to the *McDonnell Douglas* standard to accommodate reverse gender discrimination cases); *Leadbetter v. Gilley,* 385 F.3d 683, 690 (6th Cir. 2004) (discussing the four-prong test needed to establish a case of reverse gender discrimination); *See also Southerland v. Michigan Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir. 2003). As discussed above, Dean Petron and Dr. Uetz testify consistently that they jointly participated in the decision making. On top of this, Dean Petron demonstrated an acute concern for avoiding liability for the conduct at issue in this suit. (Exhibit 7, Doc. 29-7, PageID 664). If Plaintiff can make out maintain Title IX and §1983 claims in this matter—and he can—Defendants Uetz and Petron are not shielded by qualified immunity.

**III.    CONCLUSION**

For all the forgoing reasons, Dr. Charlton-Perkins respectfully submits that the Motion for Summary should be denied.

Respectfully submitted,

MEZIBOV BUTLER

/s/Marc D. Mezibov
Marc D. Mezibov (OH No. 0019316)
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513.621.8833
mmezibov@mezibov.com

*Attorneys for Plaintiff Mark Charlton-Perkins*

## CERTIFICATE OF SERVICE

A true and accurate copy of the foregoing was served to all parties of record via the Court's ECF filing system this 8th day of December 2023.

*/s/ Marc D. Mezibov*
Marc D. Mezibov (No. 0019316)