UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MARK CHARLTON-PERKINS, | : |
| | : Case No. 1:20-cv-179 |
| Plaintiff, | : |
| | : Judge Timothy S. Black |
| vs. | : |
| | : **DEFENDANTS' REPLY** |
| UNIVERSITY OF CINCINNATI, et al., | : **MEMORANDUM IN SUPPORT OF** |
| | : **THEIR MOTION FOR SUMMARY** |
| Defendants. | : **JUDGMENT** |

**I.    INTRODUCTION**

Beginning in late 2017, the University sought to hire an Assistant Professor of Cell Biology.  A search committee was convened and, after considerable vacillation, recommended Plaintiff for the position by a 3 to 1 vote.  But before any hiring decisions were made, Dr. Ken Petren made the intervening decision to cancel the search because of concerns having come to light about unfairness in the hiring process and ensuing turmoil within the Department of Biological Sciences.

As articulated in Defendants' Motion for Summary Judgment (the "Motion"), to succeed on a failure to hire claim where no hiring decision was made, Plaintiff must show that Defendants "cancelled the position specifically to unlawfully discriminate" against him. *Moore v. Abbott Lab'ys*, 780 F. Supp. 2d 600, 613 (S.D. Ohio 2011); *see Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022).  Thus, the relevant question here is whether Dr. Petren cancelled the search with discriminatory animus to avoid hiring Plaintiff because of his gender.  Based upon the admissible evidence before the Court, it is clear that he did not.  Summary judgment is appropriate and should be granted.

The record shows that Dr. Petren cancelled the search because he honestly believed that search committee chair Dr. Elke Buschbeck's prior collaboration with Plaintiff created at least

1

the perception of a conflict of interest, and he was also troubled by Dr. Buschbeck's active advocacy for Plaintiff. (Petren Dep., Doc. 49 at PageID 1576, 1599, 1602; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 659-60, 671; Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageIDs 1072, 1074, 1076) Additionally, and perhaps most importantly, Dr. Petren felt the whole situation had created such a rift in the Department that it would not be fair to bring anyone into such a contentious environment. (Petren Dep., Doc. 49 at PageID 1575-76, 1584, 1593; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658, 661-62)

To rebut these legitimate, nondiscriminatory reasons for cancelling the search, Plaintiff relies on inadmissible, irrelevant materials to attempt to establish that Dr. Petren's reasons were somehow pretextual. For example, Plaintiff points to statements made in connection with tentative hiring options which Defendants briefly considered and statements made by non-decision-makers. But Plaintiff has cited no admissible evidence that Dr. Petren (the decision-maker) cancelled the search to discriminate against Plaintiff. Viewing the facts in the light most favorable to Plaintiff, he has failed to identify a genuine dispute of material fact regarding Dr. Petren's motivation for cancelling the search and is unable to overcome summary judgment.

## II.  ARGUMENT

Plaintiff's claims that the University and Drs. Petren and Uetz refused to hire him due to his gender in violation of Title IX and the Fourteenth Amendment's Equal Protection Clause should be dismissed. To begin, the University acknowledges that it is generally subject to the requirements of Title IX. It has not argued otherwise. The issue here, however, is that *Plaintiff* is not a "person" covered by Title IX. Plaintiff does not dispute that he was working and living in the United Kingdom at the time of the challenged conduct. As a result, quite simply, he is not a "person in the United States," so Title IX does not apply to him here.

Even if the Court considers the merits of Plaintiff's Title IX claim and his analogous

2

Equal Protection claim, those claims still fail. Defendants presented the Court with considerable record evidence supporting Dr. Petren's legitimate, nondiscriminatory reasons for cancelling the search. In response, Plaintiff has failed to meet his burden to present admissible evidence discrediting those reasons. Rather, Plaintiff merely asks the Court to disbelieve Dr. Petren's well-supported legitimate, nondiscriminatory reasons for cancelling the search. That is not enough to overcome summary judgment. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 722 (6th Cir. 2004) ("[M]ere disbelief of an employer's proffered reason is insufficient to support a finding of intentional discrimination.").

Lastly, the Equal Protection claim against Drs. Petren and Uetz should also be dismissed because those claims are barred by the Eleventh Amendment and because Drs. Petren and Uetz are entitled to qualified immunity.

### A. Plaintiff's Response to Defendants' Proposed Undisputed Facts Does Not Comply With This Court's Standing Order.

Before delving in to the arguments mentioned above, it must be noted that Plaintiff's Response to Defendants' Proposed Undisputed Facts fails to comply with the Court's Standing Order because nearly all of the facts that Plaintiff purports to deny are not supported by specific citations to contrary evidence.[1] Plaintiff denies Defendants' Proposed Undisputed Facts in paragraphs 47, 49, 54, 55, 64, 65, 66, 68, 69, 72, 73, 74, 79, 80, 81, 86, 87, 88, 89, 90, 91, 92, 93, 97, and 102, but offers no citation to support denial. (Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1690-91) Because Plaintiff failed to dispute these Proposed Undisputed Facts in accordance with this Court's Standing Order, the Court should disregard

---

[1] Plaintiff's Response to Defendants' Proposed Undisputed Facts also violates the Court's Standing Order because it exceeds 20 pages, and though it has a table of contents, it does not contain a summary indicating the main sections of the memorandum, the principal arguments and citations to primary authority made in each section, or the pages on which each section and any sub-sections may be found.

3

those denials and deem those as admitted facts. *See Scully v. Hamilton Cnty. Developmental Disabilities Services*, No. 1:17-cv-685, 2021 WL 3634700, at *1 n.1 (S.D. Ohio Aug. 17, 2021).

      **B.**      <u>**Title IX Does Not Apply to Plaintiff.**</u>

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The plain language of Title IX only applies to a "person in the United States...." 20 U.S.C. § 1681(a). Plaintiff does not dispute that he was not a "person in the United States" at the time of the alleged adverse action. Instead, he insists that Title IX must apply because the decision was made in the United States by a covered entity. Plaintiff's argument misses the point. The University acknowledges that it is generally subject to Title IX. The point is that Title IX does not apply to Plaintiff in this case.

"In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'" *Artis v. D.C.*, 583 U.S. 71, 83 (2018) (quoting *Moskal v. United States,* 498 U.S. 103, 108 (1990)). "And where the statutory language provides a clear answer, [the determination] ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (citations and internal quotation marks omitted). Here, the statutory language is clear. Title IX only applies to a "person in the United States...." 20 U.S.C. § 1681(a). Because Plaintiff was not a "person in the United States," Title IX did not apply to him.

A review of courts' analyses of another statute with similar language confirms this. In *Ofori-Tenkorang v. American International Grp., Inc.*, the Second Circuit analyzed whether alleged discrimination that occurred while an employee was overseas was redressable under 42 U.S.C. § 1981. 460 F.3d 296 (2nd Cir. 2006). There, the Court held that the plaintiff's allegations related to discrimination overseas was not redressable under 42 U.S.C. § 1981 because "the plain text of Section 1981 unambiguously requires that a person be 'within the

4

jurisdiction of the United States, 42 U.S.C. § 1981(a), in order to assert rights under the statute.'" *Id.* at 303-304. The Second Circuit also rejected the plaintiff's argument that Section 1981 still applied because the contract he had with his employer was formed in the United States and the alleged discriminatory acts affecting him while he was overseas were directed by executives who were in the United States. *Id*. at 303. The Court noted that the statute at issue "require[d] that the allegedly aggrieved 'person' be 'within the United States'" and that the Court was "not free to ignore the clearly-stated purpose of Congress and expand Section 1981 to protect persons outside the 'jurisdiction of the United States.'" *Id*. at 305.

Albeit in an unpublished opinion, the Sixth Circuit similarly concluded that a plaintiff "cannot claim protection under section 1981 because he was not within the jurisdiction of the United States at the time of the alleged discrimination." *See Rodrigues v. Martin Marietta Corp*., No. 86-8403, 1987 WL 44766, at *2 (6th Cir. Sept. 16, 1987).

The same conclusion applies here. The plain language of Title IX only applies to a "person in the United States...." 20 U.S.C. § 1681(a). Plaintiff does not dispute that he was not a "person in the United States" at the time of the allegedly discriminatory conduct. Title IX does not apply here. Plaintiff's Title IX claim should be dismissed.

    **C.**    **Plaintiff's Gender Discrimination Claims Under Both Title IX And The Equal Protection Clause Fail Because Plaintiff Has Not Shown That Dr. Petren's Legitimate, Non-Discriminatory Reasons For Cancelling The Job Search Were A Pretext For Gender Discrimination.**

Plaintiff does not dispute that to succeed on his failure to hire claim where no hiring decision was made, he must show that Defendants "cancelled the position specifically to unlawfully discriminate" against him. *Moore*, 780 F. Supp. 2d at 613; *see Charlton-Perkins*, 35 F.4th at 1061. The only relevant question here is whether Dr. Petren cancelled the search with discriminatory animus to avoid hiring Plaintiff because of his gender.

5

Though Plaintiff tries to rope Dr. Uetz into this inquiry as a relevant decision maker, the record is clear that Dr. Petren made the decision to cancel the search in his sole discretion. (Petren Dep., Doc. 49, PageID 1575-76,1583-84, 1594, 1601; Uetz Dep., Doc. 29 at PageID 400, 481, 483, 509, 538, 555, 563) Dr. Petren testified in his deposition that it was "hard to say" who suggested they tentatively delay hiring, not who decided to cancel the search. (Petren Dep., Doc. 49, PageID 1575) On that point, Dr. Petren was unequivocal that he was solely responsible for the cancellation decision. (Petren Dep., Doc. 49, PageID 1575-76,1583-84, 1594, 1601) Defendants are hard pressed to find where in Plaintiff's cited testimony from the faculty meeting (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 662) that Drs. Petren or Uetz suggested they made the cancellation decision together. On the other hand, Dr. Petren opened that meeting by clearly stating, "…I had to call off the search." (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658) (emphasis added) Plaintiff has failed to point to any record evidence indicating that the decision to cancel the search was anyone's other than Dr. Petren's.

Again, the only inquiry before the Court is whether Dr. Petren cancelled the search with discriminatory animus to avoid hiring Plaintiff because of his gender. This inquiry is subject to the *McDonnell Douglass* burden shifting framework. *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 962 (S.D. Ohio 2010) (citation omitted). Once Plaintiff has made out a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason(s) for its decision. *Id.* at 963. After Defendants articulate such reasons, the burden shifts back to the Plaintiff to show Defendants' articulated reason(s) is a pretext for unlawful discrimination. *Id.*

Defendants did not challenge Plaintiff's *prima facie* case in the Motion. Rather, Defendants went straight to articulating Dr. Petren's legitimate, nondiscriminatory reasons for cancelling the search. So the central inquiry before the Court is whether Plaintiff has established

6

pretext. Nonetheless, much of Plaintiff's Memo Opp. is devoted to proving his *prima facie* case. While Defendants will not waste the Court's time by rehashing Plaintiff's *prima facie* case analysis, there are several inaccuracies in Plaintiff's *prima facie* arguments that warrant a reply.

First, Plaintiff has not presented any direct evidence that Dr. Petren cancelled the search to specifically discriminate against him. Direct evidence "proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Plaintiff's proffered direct evidence does not meet this standard. None of the statements Plaintiff cites were made in connection with the decision to cancel the search. None of the proffered direct evidence "proves the existence of" gender discrimination "without requiring any inferences." *Id*; *see also Plumb v. Potter*, 212 F. App'x 472, 478 (6th Cir. 2007) (Supervisor's statement about needing more diversity in the department was not direct evidence of sex discrimination against male plaintiff).

One of Plaintiff's purported pieces of direct evidence requires special attention. In his initial meeting with Dr. Petren, Dr. Uetz did ask Dr. Petren whether it was permissible to advance a male candidate over an equally qualified female candidate. (Uetz Dep., Doc. 29 at PageID 429-31) But Plaintiff misleadingly omits Dr. Uetz's explanation that he only asked this because he did not want to violate any University policies and omits that Dr. Petren told him there was nothing wrong with hiring a male in that scenario. (*Id.* at PageID 431, 459, 489)

Further, the circumstantial evidence Plaintiff relies on for his *prima facie* case consists of gender and diversity-related statements made by individual faculty members not responsible for cancelling the search. (*See* Pl.'s Memo Opp., Doc. 52, PageID 1678) These statements are irrelevant to Plaintif's Title IX and § 1983 claims. *See Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020) (stating that liability under Title IX "requires that the institution itself be deliberately

indifferent to known acts of ... discrimination" and that "Cat's paw liability, therefore, has no place in Title IX actions.") (citation and internal quotations omitted); *see also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their individual capacities under § 1983 can be held liable only on their own unconstitutional behavior.").

Moving past the irrelevant *prima facie* analysis, Defendants articulated Dr. Petren's legitimate, nondiscriminatory reasons for cancelling the search. Plaintiff now has the burden to show that those reasons were pretext for gender discrimination. *Amini v. Oberlin Coll*., 440 F.3d 350, 359 (6th Cir. 2006). Plaintiff has not produced admissible evidence connecting Dr. Petren's decision to cancel the search with any discriminatory animus. He has not met his burden.

As explained in the Motion, Dr. Petren cancelled the search in his sole discretion. (Petren Dep., Doc. 49, at PageID 1575; Uetz. Dep., Doc. 29 at PageID 400, 509) Dr. Petren cancelled the search because he was troubled by the sheer perception of a conflict of interest between Dr. Buschbeck and Plaintiff. (Petren Dep., Doc. 49, at PageID 1576, 1599; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 659-60, 671) He was also deeply troubled by the email evidence of Dr. Buschbeck's partiality. (Petren Dep., Doc. 49, at PageID 1576, 1599, 1602; Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageID 1072, 1074, 1076) Finally, Dr. Petren felt the whole situation had created such a rift within the department that he concluded it would be unfair to bring *anyone* into such a contentious environment. (Petren Dep., Doc. 49 at PageID 1575-76, 1584, 1593; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 661-62) Plaintiff has not shown that <u>any</u> of these <u>independent</u> reasons were pretext for gender discrimination.

Plaintiff cannot dispute that these legitimate, nondiscriminatory reasons are based in fact. Nor can he dispute that these reasons were sufficient to motivate, and did actually motivate, Dr. Petren's decision. Rather than offering affirmative evidence discrediting Dr. Petren's legitimate,

8

nondiscriminatory reasons, Plaintiff vaguely asserts that gender predominated the search and simply asks the Court to disbelieve Dr. Petren's explanations. That is not enough to show pretext. *Noble*, 391 F.3d at 722 (6th Cir. 2004) ("[M]ere disbelief of an employer's proffered reason is insufficient to support a finding of intentional discrimination."). Instead, Plaintiff must "*affirmatively prove* that the reasons are 'in fact a coverup for a [] discriminatory decision.'" *Hightower v. Keystone Auto. Indus.*, 653 F. Supp. 3d 420, 430 (N.D. Ohio 2023) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517, 519 (1993)) (emphasis added).

Again, the only relevant decision-maker in this case is Dr. Petren. The record is devoid of evidence that Plaintiff's gender played any factor in Dr. Petren's decision to cancel the search. As Defendants anticipated in the Motion, Plaintiff points to several statements made by non-decision-makers to support his narrative that the department was concerned about gender diversity throughout the search. But as explained above, Plaintiff's reliance on these statements is misplaced under the claims he asserts. *Bose*, 947 F.3d at 990; *Heyerman*, 680 F.3d at 647. In addition to their legal irrelevance to the claims at bar, those statements are isolated comments not made by the decision-maker (Dr. Petren) and, therefore, cannot establish pretext. *See Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008).

Plaintiff also misstates the timeline of events to attempt to create the illusion that conflict of interest issues were not raised until after Dr. Buschbeck objected to Dr. Uetz's suggestion that the search committee focus on the remaining candidates. Not so. The proper timeline of events is chronicled as follows: Dr. Uetz first received the search committee's recommendation in favor of Charlton-Perkins. (Buschbeck Dep., Doc. 31 at PageID 886-87) After receiving the recommendation, at least two faculty members reported conflict of interest concerns to Dr. Uetz. (Uetz Dep., Doc. 29 at PageID 433) After receiving the search committee's recommendation,

9

and <u>after</u> receiving faculty complaints, Dr. Uetz met with Dr. Petren and brought the conflict of interest concerns to his attention. (*Id.* at PageID 429-430; 433-34) Dr. Uetz then spoke to additional faculty to see if they shared similar concerns about the fairness of the search. (*Id.* at PageID 459, 539) Dr. Uetz reported back to Dr. Petren. (*Id.*; Petren Dep., Doc. 49 at PageID 1566, 1575) Only then did Dr. Uetz email the search committee to suggest focusing on the other candidates. Thus, several discussions about the conflict of interest concerns occurred <u>before</u> Dr. Uetz emailed the search committee on March 4, 2018. Plaintiff's contention otherwise is false.

Moreover, Plaintiff cannot seriously argue that Dr. Petren's legitimate, nondiscriminatory reasons are not based in fact. That is, Plaintiff cannot argue that Dr. Petren's cited reasons "simply did not happen." *Lawroski v. Nationwide Mut. Ins. Co.*, 981 F. Supp. 2d 704, 712 (S.D. Ohio 2013), *aff'd in part*, 570 F. App'x 589 (6th Cir. 2014) (internal quotations and citation removed). Plaintiff does not dispute that six faculty members (including, but not limited to, Drs. Layne, Rollmann, Gross, and Jayne) reported concerns about Dr. Buschbeck's impartiality during the search. (Pl.'s Memo Opp., Doc. 52, PageID 1684; Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1690-91) Nor does Plaintiff dispute that Dr. Uetz and Dr. Petren discussed these concerns after the search recommended Plaintiff for hire. (Pl.'s Memo Opp., Doc. 52, PageID 1668; Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1690-91). Likewise, Plaintiff does not (and cannot) dispute that Dr. Buschbeck sent emails challenging several faculty members' feedback about Plaintiff. (Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1690-91).

While Plaintiff claims the departmental rift perceived by Dr. Petren is a "frail evidentiary reed," he does not (and cannot) dispute the following facts underlying that rift[2]:

---

[2] Plaintiff admitted all these proposed statements of fact. (*See* Def. Proposed Undisputed Facts, Doc. 50-1, at PageID 1645, 1647; Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1690-91)

- 62. Approximately six faculty members complained about the search process. (Uetz Dep., Doc. 29 at PageID 539)

- 75. At a faculty meeting on March 8, 2018, and after the conflict issues had been mentioned, Dr. Buschbeck made a passionate statement defending herself against any conflict accusations. (Uetz Dep., Exhibit 17, Doc. 29-17 at PageID 740; Uetz Dep., Doc. 29 at PageID 541)

- 76. After that meeting, one faculty member sent an email to Dr. Uetz reiterating his concerns with the search. (Uetz Dep., Exhibit 15, Doc. 29-15 at PageID 736) This faculty member explained that he wondered "how did [Plaintiff] warrant this high rating …? … [Plaintiff's] rise in my opinion is tainted." (*Id.*)

- 78. There was discord among the faculty as a result of the search. (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 661-62, 664; Culley Dep., Doc. 37 at PageID 1254; Jayne Dep., Doc. 45 at PageID 1461)

With these admissions, Plaintiff cannot seriously claim that the rift perceived by Dr. Petren simply did not happen. Dr. Petren's legitimate, nondiscriminatory reasons for cancelling the search were undisputedly based in fact.

Dr. Petren's legitimate, nondiscriminatory reasons for canceling the search were honestly believed and were sufficient to, and did, motivate him. To start, Plaintiff claims that the conflict of interest concerns could not have motivated Dr. Petren to cancel the search because Dr. Buschbeck's relationship with Plaintiff was "unremarkable." But Plaintiff fails to acknowledge that Dr. Petren cancelled the search for much larger issues than Dr. Buschbeck's relationship with Plaintiff alone. Dr. Petren also considered the email evidence of Dr. Buschbeck's partiality. (Buschbeck Dep. Exhibits 44, 46, 47, Docs. 31-20, 31-22, 31-23 at PageID 1072, 1074, 1076) Dr. Petren felt that Dr. Buschbeck's emails trying to rebut negative faculty feedback about Plaintiff was unfair to the other candidates who did not have an equivalent voice fighting for them. (Petren Dep., Doc. 49 at PageID 1602-03) Dr. Buschbeck's advocacy for Plaintiff was far

11

from unremarkable and distinguishes this situation from Dr. Annie Rowe's hiring. There, a search committee member was personal friends with Dr. Rowe and had also recently collaborated with another finalist. (Buschbeck Dep., Doc. 31, at PageID 852) But in that situation, it was a search committee member, not the search chair, with the prior relationships. (*Id.*) What's more, nothing in the record suggests that that search committee member actively advocated for her friend and collaborator the way Dr. Buschbeck did here.

Dr. Petren's deposition testimony confirms that he was deeply troubled by Dr. Buschbeck's advocacy for Plaintiff. He thought Dr. Buschbeck should have stepped aside as the process went forward and explained:

> And, [ ] that kind of interaction went beyond just a perceived conflict of interest. And this is what I was referring to is, those were actions that made it unfair for the other candidates, you know, the fact that the chair of the search was -- took some actions to promote one candidate over another. . . . In my mind, those were big.

(Petren Dep., Doc. 49, at PageID 1581, 1602) (emphasis added) Plaintiff does not address Dr. Buschbeck's actions in responding to her colleagues' concerns about Plaintiff and has presented no evidence to doubt Dr. Petren's concerns.

Likewise, there is ample evidence in the record supporting Dr. Petren's fear that the whole search process was causing a rift in the department. As mentioned above, Plaintiff admits there was discord among the faculty as a result of the search. (Def. Proposed Undisputed Facts, Doc. 50-1, at PageID 1647; Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1691) Plaintiff also admits that Dr. Gross (a search committee member) reported concerns that he believed Dr. Buschbeck had a conflict of interest and that he was uncomfortable with the search process. (Def. Proposed Undisputed Facts, Doc. 50-1, at PageID 1644; Pl.'s Response to Proposed Undisputed Facts, Doc. 52-1, at PageID 1691) Moreover, the hostility in the

department at the time the search was cancelled exudes through the faculty meeting transcript. (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658, 661-62, 664, 673) Indeed, Dr. Petren's comment about the College of Arts and Sciences prior settlements further serves as evidence that he was concerned about the consequences of the rift he was perceiving.[3] Plaintiff has not offered any contrary evidence demonstrating the absence of turmoil. Here again, Plaintiff is simply asking the Court to disbelieve one of Dr. Petren's stated reasons without any affirmative support.

Plaintiff's attempt to argue that Dr. Petren's actions irregularly deviated from the hiring procedures set out in the faculty's Collective Bargaining Agreement (the "CBA") is also misplaced. The CBA states, "The appointment of a Faculty Member to an Academic Unit shall normally be based on a recommendation initiated within and approved by the Faculty of that Academic Unit using procedures developed within the Academic Unit." (Buschbeck Dep., Exhibit 25, Doc. 31-1, at PageID 1016) Even Dr. Buschbeck testified that search committees are responsible for making a recommendation for hire rather than selecting a candidate for hire. (Buschbeck Dep., Doc. 25, at PageID 792) Nor was this the first time Dr. Petren declined to follow the search committee's recommendation. Dr. Petren testified that the year before the Cell Biologist search, he cancelled a job search in the Sociology Department after it surfaced that the search had been unfairly rushed and that the committee's recommendation was a close friend of someone on the search committee. (Petren Dep., Doc. 49, at PageID 1569-70) There is also contemporaneous evidence from Dr. Petren explaining why the search could not be salvaged

---

[3] Plaintiff also appears to be arguing that Dr. Petren's concern that hiring anyone in to the Department would increase the potential for someone to bring a lawsuit against the University is somehow evidence that Dr. Petren cancelled the search because of animus against Plaintiff's sex. If anything, that concern further supports Dr. Petren's concern about the contentious nature of the Department at that time. And a concern that making a hiring decision would increase the potential for a lawsuit against the University is not sex discrimination. *See Spades v. City of Walnut Ridge, Ark.*, 186 F.3d 897, 900 (8th Cir. 1999) (An employer's fear of increased likelihood of liability stemming from continued employment of employee was a legitimate, nondiscriminatory reason for termination and was not pretext for disability discrimination.).

13

even if Dr. Buschbeck stepped aside. (Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 664) As Dr. Petren explained at the faculty meeting, the bell simply could not be unrung: "[w]hen you have someone sitting here who says, these people did not have the courage to tell me to my face that I had a problem, how does that go away at this point? . . . How do you undo that?" (*Id.*)

Plaintiff has not offered any contrary evidence to support why the Court should discredit Dr. Petren's legitimate, nondiscriminatory reasons for cancelling the search. Because Plaintiff has not met his burden to prove pretext, his Title IX and § 1983 claims should be dismissed.

> **D.** **Eleventh Amendment Immunity Bars Plaintiff's § 1983 Claim Against Drs. Petren and Uetz In Their Official Capacities.**

As it relates to Eleventh Amendment immunity, Plaintiff responds by asserting that his request for relief should be extended to any successors to Drs. Petren and Uetz's office and by asserting that requests for "reinstatement to a job position are prospective in nature and an appropriate subject for *Ex Parte Young* action." (Doc. 52 at Page ID 1687) (quoting *Diaz v. Mich. Dept. of Corr.*, 709 F.3d 956, 946 (6th Cir. 2013)). First, as it relates to Drs. Petren and Uetz's (or their successors') ability to grant the requested relief sought, Plaintiff cites no record evidence that they have such authority. In fact, Ohio Revised Code § 3361.03 provides that the University's Board of Trustees has such authority. ("The board of trustees of the university of Cincinnati shall employ, fix the compensation of, and remove the president and such number of professors, teachers, and other employees, as may be deemed necessary.").

But setting that aside, Plaintiff's response fails to even address Defendants' primary point regarding whether the *Ex Parte Young* exception can be deployed here. Plaintiff's claim is not for "reinstatement"; his claim is for "instatement." And even more unique here is the fact that Plaintiff is asking for an order "instating" him to a position at the University that does not exist.

As Defendants stated in the Motion (and Plaintiff failed to address), "instatement" in this

14

case would require creating a position that does not exist. In other words, it would compel the University—not any particular official—to expend resources not currently in use by creating a position and placing Plaintiff in it. "[A] suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). "'The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Id.* at 101 n.11 (quoting D*ugan v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

Given that any request for injunctive relief in this case would have to lie against the University, the only judgment against Drs. Petren and Uetz could be that they violated federal law in the past, which the *Ex Parte Young* exception does not permit. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993) (stating that the *Ex Parte Young* exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past"). Plaintiff's § 1983 claim against Drs. Petren and Uetz in their official capacities is therefore barred by the Eleventh Amendment.

> **E. As To Plaintiff's Claims Against Defendants Petren And Uetz In Their Personal Capacities, Such Claims Fail Because They Are Both Entitled to Qualified Immunity As A Matter Of Law.**

As explained above, Dr. Uetz did not make the decision to cancel the search. Rather, Dr. Petren cancelled the search in his sole discretion. (Petren Dep., Doc. 49, PageID 1575-76,1583-84, 1594, 1601; Uetz Dep., Doc. 29 at PageID 400, 481, 483, 509, 538, 555, 563) Thus, Plaintiff has not established that Dr. Uetz violated any of Plaintiff's clearly established constitutional rights and as such Dr. Uetz is entitled to qualified immunity.

Likewise, Dr. Petren is entitled to qualified immunity because Plaintiff has not pointed to

130512157v2

any admissible evidence that Dr. Petren cancelled the search with discriminatory intent and purpose. To the contrary, the record demonstrates precisely what occurred during the search, Dr. Petren's concerns that arose during the search, and his decision to cancel the search as a result of those concerns and unrest in the department. (Petren Dep., Doc. 49 at PageID 1566-67, 1575-76, 1584, 1593, 1599, 1602-03; Uetz Dep., Exhibit 7, Doc. 29-7 at PageID 658-62, 671)

Drs. Petren and Uetz are entitled to qualified immunity. The § 1983 claim against them should be dismissed.

## III. CONCLUSION

The job search Plaintiff applied for at the University was cancelled for the reasons set forth above and in the record materials. Because the undisputed facts show there is no material dispute about the reason for that cancellation, Plaintiff's claims against the University and its employees fail, and Defendants are entitled to judgment as a matter of law. Defendants request that the Court grant their motion for summary judgment.

Respectfully submitted,

*/s/ Evan T. Priestle*
Evan T. Priestle (0089889)
Ivy Sander (100204)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Tel: (513) 381-2838
Fax: (513) 381-0205
epriestle@taftlaw.com
isander@taftlaw.com

*Attorneys for Defendants*

130512157v2

CERTIFICATE OF SERVICE

      I hereby certify that on January 5, 2024, Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment was filed using the Court's CM/ECF system, which will send electronic notice to the following:

Marc Mezibov
Mezibov Butler
615 Elsinore Place
Suite 105
Cincinnati, OH 45202
mmezibov@mezibov.com

                                                                     */s/ Evan T. Priestle*
                                                                      Evan T. Priestle

130512157v2