## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARK CHARLTON-PERKINS,     :     Case No. 1:20-cv-179
    :
    Plaintiff,     :     Judge Timothy S. Black
    :
vs.     :
    :
UNIVERSITY OF CINCINNATI, *et al.*,     :
    :
    Defendants.     :

## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT AND
## DISMISSING THE CASE

This civil action is before the Court on Defendants' Motion for Summary

Judgment (Doc. 50) and the parties' responsive memoranda (Docs. 52, 53). Also before

the Court are Defendants' Proposed Undisputed Facts (Doc. 50-1), as well as Plaintiff's

Response to Defendants' Proposed Undisputed Facts (Doc. 52-1).

## I. BACKGROUND

On March 2, 2020, Plaintiff Mark Charlton-Perkins ("Plaintiff") brought this civil

action against Defendants University of Cincinnati ("UC"), Kenneth Petren ("Dr.

Petren"),[1] and George Uetz ("Dr. Uetz") (collectively, "Defendants"). (Doc. 1). Against

UC, Plaintiff asserts a claim under Title IX, 20 U.S.C. § 1861, alleging failure-to-hire

based on gender discrimination; and against Drs. Petren and Uetz, Plaintiff asserts a 42

---

[1] Plaintiff's Complaint, First Amended Complaint, and response in opposition to the motion for summary judgment misspell Dr. Petren's name as "Petron." (Docs. 1 and 8). The Court will use the correct spelling in this Order.

U.S.C. § 1983 claim alleging gender-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. (Doc. 1). On May 12, 2020, in response to Defendants' first motion to dismiss, Plaintiff filed a First Amended Complaint. (Doc. 8).[2]

### A. Undisputed Material Facts[3]

UC's Biological Sciences Department (the "Biology Department") is an academic unit within the College of Arts and Sciences (the "College"). (Doc. 50 at 3). Dr. Uetz served as Head of the Biology Department from 2015 to 2018, and was therefore responsible for overseeing the administration of the Biology Department, including supervising faculty and staff hiring. (Doc. 50-1, ¶¶ 1, 2). Dr. Uetz reported to Dr. Petren, who served as the Dean of the College from 2015 to 2019. (*Id.* at ¶¶ 3, 4). As Dean, Dr. Petren was responsible for approving hires and also had sole authority to cancel a search. (*Id.* at ¶¶ 5, 6).

Each year, the academic units within the College evaluate their staffing needs and submit hiring proposals to the Dean. (*Id.* at ¶ 7). In the Biology Department, once the Dean approves a hiring proposal, the Department Head appoints departmental faculty

---

[2] The First Amended Complaint included additional background allegations and clarifications but did not amend the claims. (Doc 8 at ¶¶ 22, 25).

[3] Specific citations to the record for these findings of undisputed fact are found in Defendants' motion (Doc. 50), Plaintiff's response in opposition (Doc. 52), Defendants' Proposed Undisputed Facts (Doc. 50-1), and Plaintiff's response to Defendants' proposed facts (Doc. 52-1). The Court further supplemented the facts with direct citations to the depositions, where appropriate. Additionally, the Court notes that in Plaintiff's response to Defendants' proposed facts, many of the objections are as to the form of the statement or to word choice. For purposes of this Order, the Court adopts and includes those facts in substance, but has edited the phrasing to resolve the objection.

members to serve on a search committee, including a committee chair. (*Id*. at ¶ 8). The search committee refines the job advertisement, solicits and reviews applications, interviews candidates, ranks candidates, and provides a hiring recommendation to the Department Head. (*Id*. at ¶ 9). The Department Head then shares the search committee's findings and presents a recommendation to the Dean. (*Id*. at ¶ 10).

Consistent with this process, in September 2017, the Biology Department began a search to hire an Assistant Professor of Cell Biology. (*Id*. at ¶ 12). Dr. Uetz appointed Dr. Elke Buschbeck, a full professor in the Biology Department, as chair of the search committee. (*Id*. at ¶ 13). Dr. Uetz also appointed Joshua Benoit, Joshua Gross, and Dennis Grogan to serve on the committee. (*Id*. at ¶ 14). At the time, Dr. Benoit was an Assistant Professor, Dr. Gross was an Associate Professor, and Dr. Grogan was a full Professor. (*Id*. at ¶ 15). A graduate student was also selected to serve on the search committee, but was a non-voting member. (*Id*. at ¶ 16).

Over 60 individuals applied for the Assistant Professor of Cell Biology position. (*Id*. at ¶ 17). One of those applicants was Plaintiff Mark Charlton-Perkins, Ph.D. (*Id*. at ¶ 19).

Plaintiff is a United States citizen who, in 2017, was employed as a Research Associate at the University of Cambridge in the United Kingdom (the "U.K."). (Doc. 8 at ¶ 1; Doc. 52 at 5). Plaintiff had previously spent several years working at the Cincinnati Children's Hospital Medical Center before attending graduate school at the University of Cincinnati and receiving his Ph.D. in Molecular and Developmental Biology in 2014. (Doc. 52 at 4-5). He accepted the position at the University of

Cambridge after graduating, but maintained professional contact and friendships with faculty and staff at Cincinnati Children's Hospital and UC.  (*Id.* at 5).  Specifically, one of Plaintiff's Cincinnati contacts was Dr. Buschbeck.  (*Id.*)  During Plaintiff's final year in graduate school, he spent several hours per week working in Dr. Buschbeck's lab, and Dr. Buschbeck also served on Plaintiff's thesis committee.  (Doc. 27 at 8-9, 27).  And following his graduation, Plaintiff and Dr. Buschbeck continued to collaborate, including coauthoring two academic papers togethers in 2017.  (Doc. 52 at 5).  Beyond professional collaboration, Plaintiff and Dr. Buschbeck also maintained a personal friendship and socialized together on a number of occasions.  (Doc. 50-1, ¶ 24; Doc. 27 at 66-67, 77-81; Doc. 31 at 49-51, 154-57).

On October 11, 2017, Dr. Buschbeck (who was then chair of the search committee) forwarded the faculty position opening to Plaintiff and suggested that he apply.  (Doc. 27 at 18-19; Doc. 31 at 36).  Dr. Buschbeck explained during her deposition that it was common practice for faculty members to share open positions with colleagues at other institutions, and that there was no rule prohibiting her, as chair of the search committee, from doing so. (Doc. 31 at 37, 210-211).

On December 1, 2017, the search committee whittled down the list of applicants to nine candidates—Plaintiff was one of them.  (Doc. 50-1 at ¶ 19).  The search committee then conducted Skype interviews with the nine individuals.  (Doc. 50 at 4).

 On December 12, 2017, after several Skype interviews had taken place, including Plaintiff's, Dr. Buschbeck emailed the College's Director of Graduate Student Recruitment in Access and Diversity, Marilyn Kershaw, to inquire regarding whether Dr.

Buschbeck's connection to Plaintiff would be considered a conflict of interest. (Doc. 50-1, ¶ 21). Specifically, Dr. Buschbeck's email to Ms. Kershaw stated: "One of the candidates that made it to our top 9 list is one of my collaborators (at least we recently published a paper together). Does this count as a conflict of interest? If so how should we proceed?" (*Id*. at ¶ 22). Ms. Kershaw responded: "I would not say that it is a conflict of interest as it can be expected that faculty may know one another in the discipline. Let the committee members know your connection to the candidate and proceed as you would with any other finalist." (*Id*. at ¶ 23). Dr. Buschbeck told Ms. Kershaw that the search committee was aware of Dr. Buschbeck's connection to Plaintiff. (*Id*. at ¶ 25). Dr. Buschbeck continued to serve as chair of the search committee and participated fully in discussions and decisions regarding the candidates, including Plaintiff. (*Id*. at ¶ 27).

On December 14, 2017, the search committee narrowed the candidates down to five finalists, all of whom were invited to the campus for a final, in-person round of interviews, which interviews took place in February 2018. (*Id*. at ¶¶ 28, 31). Plaintiff was one of the final five. (*Id*. at ¶ 29). However, one of the five finalists declined the invitation, thereby leaving four candidates who attended the final February 2018 interviews—two women and two men (one of whom was Plaintiff). (*Id*. at ¶¶ 29-31).

The February 2018 final interviews consisted of meetings with the search committee, the Head of the Department, and other faculty members. (Doc. 27 at 30-31). Additionally, the candidates were asked to give a one-hour long seminar on a topic of their choosing, which seminar was open to students and faculty. (*Id*.) After each candidate's visit, the search committee solicited feedback from faculty members and

students. (Doc. 31 at 172-73). Based on the evidence before the Court, the faculty and student feedback shows Plaintiff received generally unfavorable reviews. (Doc. 31 at 101-02, 173-82, Exs. 34-37, 44-47). Specifically, Plaintiff was ranked the least favored of the four candidate among the students. (*Id*. at 101-02, Ex. 35). Additionally, Dr. Buschbeck received emails from faculty members (who were not on the search committee), many of whom expressed concerns and negative opinions regarding Plaintiff's seminar presentation, his demeanor, and the suitability of his research for the Department. (*Id*. at 173-82, Exs. 34, 44-47). Dr. Buschbeck consistently replied to this negative feedback in Plaintiff's defense. (*Id*.).

On February 21, 2018, after all in-person interviews were completed, the search committee, along with Dr. Uetz, met to discuss the committee's recommendation. (Doc. 50-1, ¶ 32). At that time, each of the search committee members selected a different candidate as their top pick (Dr. Buschbeck's top choice being Plaintiff). (*Id*. at ¶¶ 33-37). Accordingly, Dr. Buschbeck asked each committee member to make a case for their top-ranked candidate. (*Id*. at ¶ 38). During the discussion, the search committee recognized the other male candidate (not Plaintiff) was the least preferred overall, so agreed to remove him from the running. (*Id*. at ¶ 39). Dr. Uetz listened to everyone present their case and took notes of the discussion. (*Id*. at ¶ 40). Seeing no consensus on a top recommendation, the committee agreed to break for the day. (*Id*. at ¶ 41).

On February 23, 2018, the search committee reconvened and voted again, resulting in a 3-1 vote in favor of Plaintiff as the top candidate. (*Id.* at ¶ 42).[4] Dr. Buschbeck shared with Dr. Uetz the search committee's 3-1 vote recommending Plaintiff. (*Id.* at ¶ 45).

On February 27, 2018, Dr. Uetz met with Dr. Petren to discuss the search committee's recommendation. (*Id.* at ¶ 46). During the meeting, Dr. Uetz asked Dr. Petren whether it was permissible to hire a male candidate for the position when there were two equally-qualified female candidates; Dr. Petren stated that it was permissible. (*Id.* at ¶¶ 48-49; Doc. 29 at 47).[5] Additionally, Dr. Uetz raised a separate issue with Dr. Petren regarding a possible conflict of interest in the search committee. (Doc. 29 at 49). Specifically, after Dr. Uetz received the committee's final recommendation, but prior to his meeting with Dr. Petren (*i.e.*, sometime between February 23 and February 27, 2018), two non-committee faculty members approached Dr. Uetz to express concern over Dr. Buschbeck's apparent conflict of interest and her bias in favor of Plaintiff. (Doc. 50-1, ¶¶ 50-53; Doc. 29 at 49-52).[6] In his deposition, Dr. Uetz stated that, "even though [he]

---

[4] The Graduate Student Representative was present and cast a vote for one of the female candidates; however, as previously determined by the committee, the student vote was not counted. (*See* Doc. 50-1, ¶¶ 16, 44).

[5] In his deposition, Dr. Uetz explained that he wanted to know whether the College of Arts and Sciences had any diversity hiring policies or practices that would require reconsideration of the committee's recommendation. (Doc. 29 at 47).

[6] In his deposition, Dr. Uetz stated that, during the February 21, 2018 committee meeting, he too had sensed Dr. Buschbeck was "very enthusiastic about [Plaintiff's] candidacy," to the extent that it prompted him to inquire of Dr. Buschbeck whether she had spoken with Ms. Kershaw regarding a potential conflict of interest. (Doc. 29 at 52).

was planning to recommend [Plaintiff] as the candidate, [he] felt an obligation to raise those issues of [alleged] impropriety" to Dr. Petren. (Doc. 29 at 51; Doc. 50-1, ¶ 55; Doc. 52-1 at 2). Dr. Petren then instructed Dr. Uetz to investigate and find out if other faculty shared similar concerns. (Doc. 50-1, ¶ 56).

As Dr. Petren directed, Dr. Uetz proceeded to talk to additional faculty, including one of the search committee members—Dr. Gross. (*Id*. at ¶ 57). Dr. Gross advised that he felt Dr. Buschbeck had bullied the junior faculty on the search committee to get them to vote a certain way. (*Id*. at ¶ 58). Further, Dr. Gross felt there was a conflict of interest relating to Dr. Buschbeck and Plaintiff and advised that he (Dr. Gross) was uncomfortable with the search process. (*Id*. at ¶ 59). Dr. Gross reported his concerns to Dr. Bruce Jayne, Assistant Head of the Biology Department. (*Id*. at ¶ 60). In addition, Dr. Jayne had heard from other faculty members regarding concerns with Dr. Buschbeck's conduct during the search (notably, regarding Dr. Buschbeck's defense of Plaintiff in response to negative feedback). (*Id*. at ¶ 61; Doc. 45 at 9-11). Dr. Jayne reported these concerns to Dr. Uetz. (Doc. 50-1 at ¶ 61). Ultimately, approximately six faculty members expressed to Dr. Uetz their concerns about Dr. Buschbeck's prior collaboration with Plaintiff and her advocacy for Plaintiff during the search process. (*Id*. at ¶ 62).

On March 2, 2018, Dr. Uetz met with Dr. Petren to share what he had learned during his investigation. (*Id*. at ¶ 63). In his deposition, Dr. Petren, in reference to this second meeting, stated: "At the point after bringing this other information in, I said, I'm going to have a hard time. I don't think we should make the offer to [Plaintiff]." (Doc.

8

49 at 19). Dr. Petren also stated in his deposition that, during the second meeting, he and Dr. Uetz discussed the option of hiring one of the other candidates instead. (*Id*.)

On March 4, 2018, Dr. Uetz emailed the search committee, stating: "Based on multiple factors, [Dr. Petren] recommended that the most appropriate course of action was to focus on the women candidates first." (*Id*. at ¶¶ 70, 71; Doc. 29-19 at 3). In the email, Dr. Uetz then asked the search committee to contact the two female candidates to determine their availability and continued interest. (*Id*.) The email does not specify the "multiple factors" referenced, nor does it make mention of the conflict of interest.

On March 5, 2018, Dr. Buschbeck responded to Dr. Uetz's email, questioning why the search committee's recommendation was not being followed. (Doc. 29-19 at 2-3). Dr. Buschbeck further stated her opinion that "[p]utting the two lower ranked candidates up first is not only against the recommendation of the committee, but also plain discrimination." (*Id*.) Dr. Uetz responded to this email, explaining that, *inter alia*, the search committee's vote was not unanimous; while Plaintiff received three committee votes (after an initial impasse), one of the female candidates was favored by the fourth search committee member, the student representative, and the faculty at large; that both female candidates had received higher average scores from the faculty than Plaintiff; and that the search committee's role in the hiring process is advisory to the Department Head and the Dean. (*Id*. at 1-2).

On March 8, 2018, Dr. Buschbeck (who, by this point, had learned of the concerns regarding a conflict of interest) met with Dr. Petren and Dr. Margaret Hanson (the Associate Dean for Natural Sciences in the College of Arts and Sciences) regarding the

search, the conflict of interest concerns, and avenues for possibly salvaging the search process. (*Id*.; Doc. 31 at 127, 132-33; Doc. 31-15 at 1-2; Doc. 47 at 8). That same day, a full faculty meeting was also held, during which the status of the search was discussed. (Doc. 50-1, ¶ 75). During this time, there was discord among the faculty as a result of the search. (*Id*. at ¶ 78). At the faculty meeting, Dr. Buschbeck addressed the faculty and spoke in defense of her conduct during the search process. (*Id*. at ¶ 75). After the faculty meeting, a faculty member sent an email to Dr. Uetz reiterating his concerns with the search. (*Id*. at ¶ 76-77).

On March 13, 2018, Dr. Petren informed the faculty that he had canceled the search. (*Id*. at ¶ 95). On March 21, 2018, Dr. Petren met with the Biology Department faculty to explain the cancelation and answer questions. (*Id*. at ¶ 96). During his meeting with the faculty, Dr. Petren stated that concerns of a conflict of interest had come up during the search, that the conflict of interest had not been handled appropriately by all parties involved (including his office), and that the circumstances had ultimately created a contentious situation in which the search process could no longer be salvaged. (Doc. 29-7). During his deposition, Dr. Petren offered the same explanation for canceling the search. (Doc. 49 at 19-20).

Dr. Petren intended to approve the Biology Department for another hire the following year. (Doc. 50-1 at ¶ 98). But the focus of a new search is based on proposals from the faculty, and Dr. Petren's role is to consider those proposals. (*Id*. at ¶¶ 99-100). By the following year, the Biology Department's needs had shifted. (*Id*. at ¶ 101). The Associate Professor in Cell Biology position was never reposted. (*Id*. at ¶ 103). Dr.

Petren is no longer the Dean of the College of Arts and Sciences; and Dr. Uetz is no longer the Head of the Department of Biological Sciences.  (*Id*. at ¶¶ 104-105).

Two years after the cancelation of the job search, Plaintiff brought this civil action, alleging that Defendants refused to hire him due to his gender, in violation of Title IX and the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 8).

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986) (emphasis added).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id*. at 249 (emphasis added).

# III. ANALYSIS

Defendants move for summary judgment as to all claims against Defendants. (Doc. 50). Specifically, Defendants argue that: (a) Eleventh Amendment immunity bars Plaintiff's Equal Protection claim against Drs. Petren and Uetz in their official capacities; (b) Plaintiff fails to assert any cognizable claims against Drs. Petren and Uetz in their personal capacities and both are entitled to qualified immunity; (c) Plaintiff's claim against UC fails because Plaintiff was not living in the United States at the time of his interview and, therefore, Title IX does not apply; and (d) all claims fail on the merits because Defendants have articulated a non-discriminatory reason for cancelling the job search and Plaintiff cannot show that the reason is merely a pretext.

## A. Eleventh Amendment Immunity as to the Equal Protection Claim

Defendant argues that Eleventh Amendment immunity bars Plaintiff's Equal Protection claim against Drs. Petren and Uetz in their official capacities, and that the *Ex Parte Young* exception does not apply given the nature of the relief Plaintiff seeks (*i.e.*, "instatement" to the UC faculty as a professor). (Doc. 50 at 12-14).

The Eleventh Amendment bars "any suit in law or equity, commenced or prosecuted against one of the United States." U.S. Const. amend. XI. The Eleventh Amendment also extends to bar "suits for monetary relief against state officials sued in their official capacity." *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993).

However, in *Ex Parte Young*, the Supreme Court established an exception to this immunity for state officials, such that the Eleventh Amendment "does not preclude

actions against state officials sued in their official capacity for *prospective* injunctive or declaratory relief." *Thiokol*, 987 F.2d at 381 (citing *Ex Parte Young*, 209 U.S. 123 (1908)) (emphasis added). Simply put, the *Ex Parte Young* exception to Eleventh Amendment immunity "rests on the premise … that when a federal court commands a state official to do nothing more than refrain from violating federal law, [the state official] is not the State for sovereign-immunity purposes." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)). And, in that regard, the Sixth Circuit has held that "claims for **re**instatement are prospective in nature and appropriate subjects for *Ex parte Young* actions." *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) (quoting *Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002)) (emphasis added).

Notably, however, the Eleventh Amendment still bars a suit against a state official if "the state is the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101 (quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464 (1945)). "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, … or if the

13

effect of the judgment would be 'to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (internal quotations and citations omitted); *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment").

Here, while "claims for reinstatement are prospective in nature," Plaintiff cannot seek "reinstatement" because he did not receive, nor has he ever held, the faculty position for which he applied. *See Diaz*, 703 F.3d at 964. Rather, Plaintiff seeks "instatement" in the first instance to a position that he believes he was unlawfully denied. To complicate the matter, however, the position was never filled by anyone and was ultimately cancelled. In other words, Plaintiff asks to be given a job that does not currently exist. Thus, the relief Plaintiff seeks would require the University of Cincinnati (a public institution) to <u>create and fully fund a new position just for Plaintiff</u>, based on the argument that the job's non-existence is the result of Drs. Petren and Uetz's alleged prior discriminatory conduct. But Drs. Petren and Uetz do not have the authority to create new positions, nor are they responsible for funding the faculty.[7] Therefore, the entirety of the burden would be borne by the University of Cincinnati and, by extension, the State and the public.

---

[7] As Defendants note in their reply brief, the University's Board of Trustees is responsible for determining the availability and compensation of faculty positions. (Doc. 53 at 14) (citing Ohio Rev. Code § 3361.03 ("The board of trustees of the university of Cincinnati shall employ, fix the compensation of, and remove the president and such number of professors, teachers, and other employees, as may be deemed necessary")).

To be sure, as the Supreme Court explained in *Edelman*, a proper claim under the *Ex Parte Young* exception could result in a monetary loss, such as when "fiscal consequences to state treasuries [are] the necessary result of compliance with decrees which by their terms were prospective in nature." 415 U.S. at 667-68. But *Edelman* distinguishes such a necessary expenditure from the notion of "equitable restitution," *i.e.*, "a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Id*. at 668. And, here, Plaintiff's claim falls into the latter category. That is, there is no continuing violation to enjoin. There is merely the allegation of a past wrong that Plaintiff seeks to rectify at the University's expense. Thus, Plaintiff's claim is not prospective in nature, and the *Ex Parte Young* does not apply.

Accordingly, Eleventh Amendment immunity bars Plaintiff's Equal Protection claim against Drs. Petren and Uetz in their official capacities.

### B.  Qualified Immunity as to the Equal Protection Claim

Defendants further argue that qualified immunity shields Drs. Petren and Uetz against the Equal Protection claim in their personal capacities because Plaintiff fails to demonstrate discriminatory intent or the violation of a clearly established right. (Doc. 50 at 20-21).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, in resolving a qualified immunity claim, the Court must undertake a two-

15

step inquiry: (1) whether "the facts that a plaintiff has alleged … or shown … make out a violation of a constitutional right"; and (2) "if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citations omitted). "On a summary judgment motion, the burden is on the plaintiff to satisfy both prongs." *Sexton v. Cernuto*, 18 F.4th 177, 184 (6th Cir. 2021) (citing *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018)) (emphasis added).

As the Court discusses in Section III.D., *infra*, while Plaintiff can show that candidates' genders were referenced and the faculty's gender-balance was discussed during the search process, Plaintiff fails to show that gender discrimination motivated either the decision not to award him the position or the cancelation of the search.  Thus, the Court cannot conclude that Plaintiff has met his burden at the first-stage of the analysis.

Moreover, even if Plaintiff's allegations and evidence were sufficient to establish the violation of a constitutional right, Plaintiff fails to evidence that the right was "clearly established."  Specifically, Plaintiff argues that "it is well-settled case law in this Circuit that gender discrimination and reverse gender discrimination is unlawful, and the cases so holding are legion."  (Doc. 52 at 33).  However, in undertaking a qualified immunity analysis, the Court must ensure that the constitutional right in question is "[d]efined at the appropriate level of generality—a **reasonably particularized** one." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) (emphasis added).  Indeed, "[i]n deciding whether a right has been clearly established, the Supreme Court has 'repeatedly'

16

warned lower courts not to define the right at 'a high level of generality.'" *Id*. at 508 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Thus, turning back to the instant case, "[t]he pertinent question is **not** whether the law banning discrimination on the basis of sex is clearly established, **but a more nuanced one**…." *Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 WL 17753528, at *5 (6th Cir. Dec. 19, 2022) (emphasis added).

Here, following a prolonged interview process with multiple candidates, the search committee narrowed its list of finalists to three individuals—one male (Plaintiff) and two females—and ultimately settled on recommending Plaintiff for the faculty position. Drs. Petren and Uetz consulted with one another regarding the recommendation and the search process, after which Dr. Petren briefly considered hiring the other two candidates instead—both of whom were female (**the search committee** had already excluded all male candidates other than Plaintiff). Dr. Petren's consideration of the other two candidates in lieu of Plaintiff led to Dr. Buschbeck raising concerns of gender discrimination, whereas other faculty members questioned Dr. Buschbeck's investment in and bias for Plaintiff. Ultimately, Dr. Petren made the decision to halt the hiring process—a decision that eventually became permanent when the open position was canceled altogether.

Therefore, the question here is, whether it is a clearly established constitutional violation to stop and ultimately cancel a contentious hiring process after allegations of gender discrimination are raised. Plaintiff does not provide citation to any case law to

answer this question in the affirmative, nor has the Court found any sufficiently similar cases.[8]

Accordingly, the Court finds that Plaintiff has not met his burden to show the violation of a clearly established constitutional right and, accordingly, qualified immunity shields Drs. Petren and Uetz against the Equal Protection claim in their personal capacities.

### C. Title IX's Applicability

Pursuant to Title IX: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."  20 U.S.C. § 1681(a).  Thus, Defendants argue that Plaintiff's Title IX claim against UC fails because Title IX, by its plain language, applies only to individuals "in the United States," whereas Plaintiff was residing in the U.K. at the time the job search was canceled.  (Doc. 50 at 14).  The Court finds Defendants interpretation of the language would frustrate the purpose of the legislation and invite arbitrary inconsistency in the application of the law.

---

[8] There is, however, ample case law establishing that judgment in favor of an employer is proper on an employment discrimination claim when the employer makes a "reasonably informed and considered decision" to take adverse employment action based on the employer's "honest belief" in a nondiscriminatory basis for the adverse action, even if the basis for the decision is "later shown to be mistaken, foolish, trivial, or baseless."  *E.g.*, *Hardesty v. Kroger Co*., 758 F. App'x 490, 493 (6th Cir. 2019); *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530-31 (6th Cir. 2012); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009); *Braithwaite v. Timken Co*., 258 F.3d 488, 494 (6th Cir. 2001).

"Congress enacted Title IX in 1972 with two principal objectives in mind: '[T]o avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 702 (1979)). Moreover, Title IX was enacted under Congress' Spending Clause powers and, therefore, the legislation operates by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Gebser*, 524 U.S. at 286). In other words, "in return for federal funds, the [recipients] agree to comply with federally imposed conditions," which, in the context of Title IX, means that the entity accepting federal funding "voluntarily and knowingly" agrees to refrain from discriminatory practices. *Cummings*, 596 U.S. at 219 (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)).

Speaking in terms of the Supreme Court's analogy, UC is (as it acknowledges), generally, a party to the Title IX "contract." (See Doc. 53 at 4). Further, here, all relevant decisions were made within the United States; which decisions, in turn, affected Plaintiff, who is a United States citizen. And while the Court acknowledges that Title IX's language prohibits discrimination against a "person in the United States," it bears noting that the language does not specify the need to *reside* in the United States. Thus, Defendants' argument relies on the notion that Title IX's application hinges upon a plaintiff's physical location at the precise moment a cause of action arises. But, as the

19

Supreme Court has stated, the purpose of Title IX, is to "avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" *Gebser*, 524 U.S. at 286. Allowing Title IX's protection to be turned on and off based on nothing more than where a plaintiff happens to be located at any given moment would severely undermine the purposes of the legislation.

Moreover, adopting such an interpretation would result in arbitrary and inconsistent applications of the law. For example, if, after his interview, Plaintiff had opted to stay in the United States for a few weeks and visit family before returning to the U.K., Defendants' argument would be moot because Plaintiff would have been "in the United States." On the other hand, if, hypothetically, a plaintiff resided in the United States but traveled abroad for even a single day, and that day happened to be when a discriminatory decision was made, that plaintiff would lose protection under Title IX.

In support of its argument, the defense cites to two cases—*Ofori-Tenkorang v. American International Grp., Inc.*, 460 F.3d 296 (2nd Cir. 2006) and *Rodrigues v. Martin Marietta Corp.*, No. 86-8403, 1987 WL 44766 (6th Cir. Sept. 16, 1987). The Court finds neither case persuasive in this context.

To start, both of Defendants' cited cases involve claims under 42 U.S.C. § 1981, which statute provides that "[a]ll persons *within the jurisdiction of the United States* shall have the same right *in every State and Territory* … as is enjoyed by white citizens …." 42 U.S.C. § 1981(a). Thus, unlike Title IX, the language of § 1981 quite expressly and repeatedly delineates the jurisdictional boundaries the law's protections.

Additionally, both of Defendants' cited cases involved conduct that occurred outside the United States. In *Ofori-Tenkorang*, the plaintiff alleged that his employer (based in Connecticut and London) subjected him to racial discrimination; however, the plaintiff was living and working in South Africa at the time, and the alleged discrimination consistently arose from or resulted in acts that occurred in South Africa. 460 F.3d at 299. Similarly, *Rodrigues* involved "a Brazilian national employed, and later laid off, in Brazil, by a Brazilian subsidiary of a United States corporation …." 1987 WL 44766 at *1. In both cases, the Second and the Sixth Circuits rejected plaintiffs' arguments that § 1981's protection traced back to the location of hiring or where the discriminatory decisions were made, citing instead to the express jurisdictional limitations of § 1981's language. But Title IX's language is far less direct. Moreover, the entirety of § 1981's focus is on ensuring equal rights of individuals within the United States and its territories, whereas Title IX focuses on ensuring non-discriminatory practices from recipients of federal funds. Thus, Title IX's language affords greater room for interpretation, and its purpose is most logically accomplished by looking to the location of the conduct rather than the precise location of the plaintiff.

In short, while the Court agrees that the language of Title IX references persons "in the United States," adopting Defendants' interpretation would frustrate the purpose of the law and result in inconsistent application of Title IX's protection based on an arbitrary factor. Accordingly, the Court finds that Title IX's protections are applicable in this instance.

### D. Title IX and Equal Protection Claims

Finally, Defendants argue that Plaintiff's gender discrimination claims fail under both Title IX and the Equal Protection Clause because Plaintiff cannot show that Defendants' legitimate, non-discriminatory reason for canceling the job search was a pretext.

The Court analyzes a Title IX discrimination claim using the same legal standard applicable to a claim brought under Title VII. *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007). Similarly, "[t]o bring a successful § 1983 claim under the Fourteenth Amendment's Equal Protection Clause, Plaintiff must prove the same elements as are required to establish a disparate treatment claim under Title VII." *Black v. Columbus Pub. Sch.*, 124 F. Supp. 2d 550, 576 (S.D. Ohio 2000), aff'd in relevant part, 79 F. App'x 735, 738 (6th Cir. 2003); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988).

"A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997)).

"[D]irect evidence is that evidence which, if believed, <u>requires</u> the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (quoting *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)) (emphasis added). In other words, "direct evidence does not require a factfinder to draw any

inferences" in order to conclude discriminatory motives played a part in the employment action. *Kroger Co.*, 319 F.3d at 865 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (noting that, "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent")). "Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, 'the burden of both production and persuasion shifts to the employer to prove that it would have [taken the same action] even if it had not been motivated by impermissible discrimination.'" *Id.*

Conversely, if a plaintiff relies on circumstantial evidence of discrimination, the Court applies the "*McDonnell Douglas* burden-shifting approach" to evaluate the allegations. *Johnson*, 215 F.3d at 572; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff successfully makes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant carries its burden, the burden shifts back to the plaintiff to evidence that the defendant's stated reasons are a pretext. *Burdine*, 450 U.S. at 253.

Accordingly, the Court must, as an initial matter, determine whether Plaintiff has presented direct evidence of discriminatory motives, or whether the claims rely solely on circumstantial evidence.

Plaintiff argues that "[t]he record is rife with direct evidence of discrimination," and identifies a number of instances in which Drs. Uetz and Petren referenced the gender of the candidates, discussed the gender balance of the faculty, or stated intent to "focus on the women candidates." (Doc. 52 at 20-22). However, evidence that gender was referenced or discussed is **not** the equivalent of evidence that "*requires* the conclusion that [gender] was at least a motivating factor in the employer's actions." *Kroger Co*., 319 F.3d at 865 (emphasis added). Plaintiff's cited evidence accomplishes the former (*i.e.*, establishing that gender was referenced), but not the latter (*i.e.*, requiring the conclusion that gender was a motivating factor).

Additionally, Plaintiff's examples are often misleading or taken out of context. For instance, Plaintiff quotes Dr. Uetz's deposition, in which Dr. Uetz stated that he asked Dr. Petren whether it was appropriate to advance a male candidate over two equally qualified female candidates. (Doc. 52 at 20). But Plaintiff excludes the remainder of the deposition testimony, in which Dr. Uetz explains that his inquiry was intended to determine whether the College of Arts and Sciences adhered to any diversity hiring policies. (Doc. 29 at 47). And, most critically, Plaintiff excludes Dr. Uetz's testimony stating that Dr. Petren responded to the inquiry by stating it was permissible to hire a male candidate over the female candidates. (*Id*.)

In short, when viewed in full and in context, Plaintiff's cited examples do not directly evidence discriminatory motives and are, instead, circumstantial at best. Therefore, the Court applies the "*McDonnell Douglas* burden-shifting approach" to evaluate the allegations. *Johnson*, 215 F.3d at 572.

To establish a *prima facie* case for failure to hire claim, a plaintiff must demonstrate that: (1) he or she was a member of a protected class; (2) he or she applied and was qualified for the job; (3) despite his or her qualifications, he or she was rejected; and (4) following the rejection, the position was filled by someone outside the protected class, or the position remained unfilled or was canceled to discriminate against plaintiff. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022); *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) ("The *McDonnell Douglas* test arose in the context of racial discrimination in hiring, but the Supreme Court recognized the need to adapt the test to different employment contexts").[9]

Defendants' motion does not challenge Plaintiff's *prima facie* case and, thus, effectively concedes the first step of the *McDonnell Douglas* analysis.  Accordingly, the issues before the Court are as to whether Defendants can "articulate some legitimate, nondiscriminatory reason" for its actions and, if so, whether Plaintiff can prove that

---

[9] The Court notes that claims of "reverse discrimination" have long been held to a higher evidentiary standard, under which Plaintiff was required to demonstrate that "he was intentionally discriminated against 'despite his majority status,'" by presenting "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  *E.g., Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985); *Zambetti.*, 314 F.3d at 255 (6th Cir. 2002).  However, in June 2025, the Supreme Court held that the text and purpose of Title VII do not differentiate between discrimination against individuals in the minority versus majority and, therefore, the heightened "background circumstances" requirement was improper.  *Ames v. Ohio Dep't of Youth Srvs.*, 605 U.S. 303 (2025).  This Court further notes that discrimination claims under Title IX and the Equal Protection Clause are analyzed under Title VII's legal framework.  *Nelson*, 226 F. App'x 448 at 454; *Black*, 124 F. Supp. 2d at 576.  Accordingly, for purposes of this Order, the Court will not apply the heightened standard.

Defendants' stated reasons are a pretext. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253.

Here, Defendants can and have successfully articulated a legitimate, nondiscriminatory basis for not hiring Plaintiff, calling off the search process, and canceling the position altogether. Specifically, Defendants have consistently maintained that the search was canceled because the perceived conflict of interest created too much contention among the faculty; and the position was never re-posted because the needs of the Biology Department shifted, as determined by the faculty at large. Accordingly, the burden shifts to Plaintiff to show that the articulated reason was a pretext.

"The plaintiff may demonstrate that the defendant's explanation was merely pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the [adverse decision], or (3) that the proffered reason was not sufficient to motivate the [adverse decision]." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). In this regard, "plaintiff must produce sufficient <u>evidence</u> from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants 'intentionally discriminated' against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997)). In other words, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

Plaintiff argues that "the record does not support [Defendants'] version of events" and "[i]nstead, it shows overwhelmingly that concerns about gender predominated Defendants' decision not to hire [Plaintiff] and to cancel the search entirely to mask their discrimination." (Doc. 52 at 26). The Court cannot agree with this statement.

Specifically, the evidence shows and, indeed, Plaintiff does not dispute, that, during the search, but prior to its cancelation, a number of faculty members, as well as at least one search committee member, expressed concerns regarding Dr. Buschbeck's conflict of interest in favor of Plaintiff, and faculty members questioned the legitimacy of Plaintiff's selection by the search committee. (Doc. 50-1 at ¶¶ 50-53, 56-63, 76-77). The evidence shows, and Plaintiff does not dispute, that Dr. Buschbeck and Plaintiff were, in fact, colleagues, collaborators, and personal friends. (*Id*. at ¶ 24). The evidence shows, and Plaintiff does not dispute, that after Plaintiff's final interview for the position, Dr. Buschbeck received critical feedback regarding Plaintiff, which feedback Dr. Buschbeck consistently attempted to rebut. (*Id*. at ¶¶ 82-85). The evidence shows, and Plaintiff does not dispute, that the search committee (while in Dr. Uetz's presence) was initially evenly split as to their top choice among the four finalists—*i.e.*, each of the four voting committee members cast their vote for a different finalist—and that Dr. Buschbeck was the only vote in favor of Plaintiff. (*Id*. at ¶¶ 32-37). The evidence shows, and Plaintiff does not dispute, that, after further discussion, the committee agreed on a last place finalist—*i.e.*, the other male candidate—and excluded him from consideration, but still could not reach a consensus as to their top choice. (*Id*. at ¶¶ 39, 41). The evidence shows, and Plaintiff does not dispute, that the committee agreed to adjourn their meeting,

and only after resuming discussions (outside of Dr. Uetz's presence) did they reach a 3 to 1 vote in favor of Plaintiff, two days after they initially convened. (*Id.* at ¶ 42). The evidence shows, and Plaintiff does not dispute, that after receiving the committee's recommendation but before reporting the recommendation to Dr. Petren, Dr. Uetz received reports from faculty members expressing their belief that Dr. Buschbeck acted improperly during the search. (*Id.* at ¶ 50). The evidence shows, and Plaintiff does not dispute, that Dr. Uetz met with Dr. Petren to report the recommendation of the committee and that, during the meeting, Dr. Petren instructed Dr. Uetz to further investigate the faculty's conflict of interest concerns and to report back. (*Id.* at ¶¶ 46, 56-57, 63). The evidence shows, and Plaintiff does not dispute, that Dr. Uetz's investigation revealed similar concerns from other faculty members, including, *inter alia*, one of the search committee members (as well as the Graduate Student Representative) who "felt like Dr. Buschbeck had bullied the junior faculty on the search committee to get them to vote a certain way." (*Id.* at ¶¶ 58, 62). The evidence also shows, and Plaintiff does not dispute, that the search process and the conflict of interest question became a topic of concern and discussion within the Biology Department at large, and that there was "discord among the faculty as a result of the search." (*Id.* at ¶¶ 75-78). The evidence shows, and Plaintiff does not dispute, that Dr. Petren ultimately canceled the search, but intended to approve the Biology Department for another hire the following year. (*Id.* at ¶ 95, 98). Finally, the evidence shows, and Plaintiff does not dispute, that faculty members make proposals regarding the focus of a new search, that Dr. Petren's only role is to consider the faculty's

proposals, and that, by the following year, the Biology Department's needs had shifted. (*Id.* at ¶¶ 99-101).

In short, there is ample evidence in the record to support Defendants' articulated basis for canceling the search and for never reposting the position. That is, the record is replete with evidence that the search process and Dr. Buschbeck's role were a cause of great concern among faculty members, and there is substantial evidence to support the legitimacy of the faculty's concerns. Additionally, Dr. Petren's decision to cancel the search was not an immediate reaction and, indeed, only came after an investigation and a number of meetings and discussions, including a recorded faculty meeting that further supports Dr. Petren's stated perception that the search process had created a rift among faculty and devolved beyond the point of salvaging. And, critically, it is undisputed that the faculty could have proposed reinitiating the search for the same position, but such a proposal was never made, and the needs of the Biology Department subsequently shifted.

Where the evidence is lacking, however, is in Plaintiff's assertion that discussions of gender dominated Defendants' decision to forego Plaintiff or to cancel the search. To be clear, the Court acknowledges that a number of faculty and students reported favoring greater diversity.[10] But the faculty and students were not the decisionmakers. Indeed, not even Dr. Uetz was the final decisionmaker. Plaintiff does not dispute that, as the Dean, Dr. Petren was responsible for approving the new hire and also had sole authority to cancel the search; nor does Plaintiff dispute that it was Dr. Petren who canceled the

---

[10] At times, these calls for diversity were gender-specific, but in other instances, could legitimately be construed as referencing diversity as to the candidate's field of research.

search.  (Doc. 50-1, ¶¶ 5, 6, 95).  But <u>Plaintiff fails to cite to **any** instance in which Dr.</u> <u>Petren expressed a sentiment that could be reasonably construed as discriminatory</u>.  Indeed, even accounting for Dr. Uetz's inquiry as to hiring a male over a female candidate, or his subsequent comment regarding "focus[ing] on the women candidates," the reality is that no female candidate was ever hired to the position, and there is <u>no</u> <u>evidence</u> that those comments played any part in the decision not to hire Plaintiff or to cancel the search.

In short, Plaintiff essentially relies on any references to gender—regardless of the context or the speaker—to serve as potential points of ambiguity from which discrimination may be inferred.  But, absent any evidence, Plaintiff's own alternative interpretation is insufficient to create a factual dispute.  *See Block v. Meharry Med. Coll*., 723 F. App'x 273, 280 (6th Cir. 2018) ("<u>**Disputing facts is not enough**—instead, the</u> <u>**plaintiff must produce evidence** 'demonstrat[ing] that the employer did not 'honestly</u> <u>believe' in the proffered nondiscriminatory reason for its adverse employment action'</u>") (quoting *Braithwaite*, 258 F.3d at 494) (emphasis added).  Ultimately, the record plainly belies the assertion that Defendants' proffered reason had no basis in fact, and Plaintiff fails to evidence that the articulated reason did not actually motivate Defendants' decision or that the proffered reason was insufficient to motivate the decision.

Accordingly, Plaintiff fails to evidence that Defendants' explanation is a pretext or that the decision was motivated by anything other a contentious search effort and the desire not to hire a new employee under the cloud of questionable circumstances.  Thus, summary judgment in favor of Defendants is required.

## IV.  CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment (Doc. 50) is

**GRANTED**, and this case is dismissed with prejudice.  The Clerk's Office shall docket a

Judgment accordingly.

**IT IS SO ORDERED**.

Date:  8/15/2025

Timothy S. Black
United States District Judge